# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **REPUBLIC OF PERU** | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. <u>1:08-cv-2109</u> |
| | ) Judge Henry H. Kennedy |
| **YALE UNIVERSITY** | ) |
| | ) |
| Defendant. | ) |
| | ) |

### PLAINTIFF REPUBLIC OF PERU'S RESPONSE TO DEFENDANT YALE UNIVERSITY'S MOTION TO DISMISS THE AMENDED COMPLAINT FOR LACK OF PERSONAL JURISDICTION AND IMPROPER VENUE

Dockets.Justia.com

## TABLE OF CONTENTS

I.    Introduction ................................................................................................ 1

II.   This Court Has Jurisdiction Over Yale ...................................................... 3

      A.    This Court Has Specific Jurisdiction Over Yale .............................. 4

            1.    Yale Purposefully Directed Its Activities At This Forum ........................ 5

                  a.    The 1911 Expedition ................................................. 5

                  b.    The 1912 Expedition ................................................. 7

                        (1)    Financial Support from NGS, which at all times
                               relevant herein, was located and doing business in
                               Washington, D.C ................................................. 7

                        (2)    Logistical Support from NGS ............................. 8

                        (3)    Support from the United States Government ................. 10

                  c.    The 1914-1915 Expedition ...................................... 11

                        (1)    Financial Support from NGS ............................. 12

                        (2)    Logistical Support from NGS ............................. 12

            2.    Peru's Injuries Arise Out Of Or Relate To Yale's Activities In This
                  Forum ............................................................................... 13

                  a.    Violation of Peruvian Law, Replevin, Wrongful Retention,
                        Conversion, and Related Claims for Civil Conspiracy ............... 14

                  b.    Breach of Fiduciary Duty, Fraud, Fraudulent
                        Misrepresentation, and Related Claims for Civil
                        Conspiracy ...................................................... 15

                  c.    Breach of Contract and Breach of Bailment Contract ............... 16

                  d.    Unjust Enrichment and Claims for Accounting ..................... 18

      B.    This Court Has General Jurisdiction Over Yale ............................. 18

            1.    Yale's Contacts with this Forum Are Regular and Continuous ............. 19

            2.    Because Yale Told Peru That It Would Accept Service In Its
                  "Customary Manner," Namely, By Accepting Service In
                  Connecticut, Yale Cannot Now Assert  The Failure To Be Served
                  In This Forum As A Defense To General Jurisdiction ..................... 20

      C.    The Exercise Of Jurisdiction Comports With Due Process ................... 24

      D.    Venue is Proper .......................................................... 26

III.  Conclusion ................................................................................................ 28

# TABLE OF AUTHORITIES

**Cases**

AMAF Int'l Corp. v. Ralston Purina Co., 428 A.2d 849, 850 (D.C. 1981) ......................... 18, 20

Arista Records, Inc. v. Sakfield Holding Co. S.L., 314 F. Supp. 2d 27, 31 (D.D.C. 2004)..... 3, 20

Ausbrooks v. Ausbrooks, 493 A.2d 324, 325 (D.C. 1985)...................................................... 21

Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472-73 (1985)................................................ 4

Cassidy v. Owen, 533 A.2d 253, 255 (D.C. 1987)................................................................ 22

Chrysler Corp. v. General Motors Corp., 589 F.Supp. 1182, 1205 (D.D.C. 1984) ............... 14, 18

Cockrell v. Cumberland Corp., 458 A.2d 716, 717 (D.C. 1983).............................................. 25

Cohane v. Arpeja-California, Inc., 385 A.2d 153, 158 (D.C. 1978) ....................... 3, 14, 15, 18

Crane v. New York Zoological Soc., 894 F.2d 454, 456 (D.C.Cir. 1990) ................................... 3

Davis v. Davis, 305 U.S. 32 (1938)....................................................................................... 21

Dooley v. United Technologies Corp., 786 F.Supp. 65 (D.D.C. 1992) ................................ 4, 24

Edmond v. United States Postal Serv. Gen. Counsel, 949 F.2d 214, 424 (D.C.Cir. 1991)........... 3

Elemary v. Philipp Holzmann A.G., 533 F.Supp.2d 144,150 (D.D.C. 2008) ............................ 28

Environmental Research Int'l, Inc. v. Lockwood Greene Engineers, Inc., 355 A.2d 808, 811
(D.C. 1976)........................................................................................................................ 4

Everett v. Nissan Motor Corp., 628 A.2d  106, 108 (D.C. 1993) ........................................... 25

First of Michigan Corp. v. Bramlet, 141 F.3d 260, 263 (6th Cir. 1998) .................................. 26

Gorman v. Ameritrade Holding Corp., 293 F.3d 506, 510 (D.C.Cir. 2002) .............................. 25

Helicopteros Nacionales de Columbia, S.A. v. Hall, 466 U.S. 408, 414 (1984) ...............4, 18, 25

Hughes v. A.H. Robbins Company, Inc., 490 A.2d 1140, 1146 (D.C.App. 1985)...................... 24

Insurance Corp. of Ireland, LTD v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 703-05
(1982)............................................................................................................................... 21

International Shoe v. Washington, 326 U.S. 310, 316 (1945)............................................... 4, 24

Ironbound Partners, LLC v. Source Interlink Companies, Inc., 2005 WL 3274575, *4 (D.D.C.
2005)................................................................................................................................. 26

Keaton v. Hustler Magazine, Inc., 465 U.S. 770 (1984) .................................................... 4, 25

Lamont v. Haig, 590 F.2d 1124, 1134 (D.C.Cir.1978) .......................................................... 27

Modaressi v. Vedadi, 441 F. Supp. 2d 51, 57 (D.D.C. 2006)................................................. 27

Naartex Consulting Corp v. Watt, 722 F.2d 779, 789 (D.C. Cir. 1983)................................... 26

Neufeld v. Neufeld, 910 F.Supp. 977, 986 (S.D.N.Y. 1996)................................................... 27

Nolan v. Nolan, 568 A.2d 479, 484 (D.C. 1990)................................................................... 22

Price v. Griffin, 359 A.2d 582 (D.C. Cir. 1976) ................................................................... 20

Quarles v. General Investment & Dev. Co., 260 F.Supp.2d 1, 8 (D.D.C. 2003)....................... 26

Reuber v. United States, 750 F.2d 1039, 1048 (D.C. Cir. 1984) ............................................ 28

Ross v. Product Development Corp., 736 F.Supp. 285, 290 (D.D.C. 1989) ............................. 20

Schwartz v. CDI Japan, Ltd., 938 F.Supp. 1, 4-5 (D.D.C. 1996) ..................................... 3, 24

see also Great Socialist People's Libyan Arab Jamahiriya v. Miski ........................................ 27

Sharp Elec. Corp. v. Hayman Cash Register Co., 655 F.2d 1228, 1229 (D.C.Cir.1981)........... 27

Shoppers Food Warehouse v. Moreno,  746 A.2d 320, 331 (D.C. 2000) ...................4, 14, 17, 25

Storey v. Hailey, 441 S.E.2d 602 (N.C.App. 1994) .......................................................... 22, 23

Tresway Aero, Inc. v. Superior Court of Los Angeles County, 487 P.2d 1211 (Cal. 1971)........ 23

World-Wide Volkswagon Corp. v. Woodson, 444 U.S. 286, 297 (1980).................................. 24

**Statutes**

D.C. Code § 13-423 .................................................................................................5, 14, 17

D.C. Code § 29-101.99(e)(2) ....................................................................................... 24

Plaintiff Republic of Peru ("Peru") responds to Defendant Yale University's ("Yale") Motion to Dismiss the Amended Complaint for Lack of Personal Jurisdiction and Improper Venue and states:

## I.     INTRODUCTION

The case concerns the improper and tortious retention of historically significant artifacts[1] ("Artifacts") taken from Peru by Yale University.  In the early 1900s and upon Yale's agreement to be bound by certain conditions, Peru permitted Yale to conduct a series of expeditions to Machu Picchu and surrounding areas in Peru, led by Yale Professor Hiram Bingham ("Bingham").  These expeditions were made possible only through efforts by Yale and Bingham to garner financial and diplomatic support from institutions and individuals located in Washington, D.C., such as the National Geographic Society ("NGS") and its Director, Gilbert Grosvenor ("Grosvenor"); various U.S. government agencies, including then President William Howard Taft.; and the Peruvian Ambassador to the United States; its co-sponsor on two of the expeditions.

Commencing in or around 2002, the parties began engaging in a series of discussions, relating to the return of these Artifacts to Peru by Yale, as well as the circumstances acceptable to Peru under which Yale might have continued access to the Artifacts based on Yale's often-expressed desire to continue scientific studies on those items.  As is often the case with such negotiations, the more the parties discussed, the less they seemed to be able to achieve an acceptable resolution.  The low point in that regard, on or about December 8, 2005, was when

---

[1]     Interestingly, at the outset of its Motion to Dismiss, Yale characterizes the artifacts to the Court as "samples of old Incan materials, primarily fragments of ceramic, metal and bone."  (Dkt. 18-3 at page 1), as if they were of pedestrian or no value.  Yet Yale itself, while promoting and profiting from these same materials, previously described them as "***the finest surviving examples of Inca art***" that "***form a unique scientific, historic, and artistic resource that enables us to reconstruct the daily life of Machu Picchu at its zenith 500 years ago***."  Certification of Christina E. Ponig ("Ponig Cert."), attached as Exhibit A, at para. 3 (emphasis added).  To be sure, notwithstanding Yale's most recent characterization, these materials are national treasures to the Peruvian people.

Yale declared for the first time during the pendency of those talks that it now claimed ownership and title to the artifacts and that it did not intend to return any of them to Peru.

During the next three (3) years, the parties continued to seek to find a solution that was acceptable to both sides. Ultimately, the failure to reach any such solution left Peru with no other alternative but to initiate the instant matter.

On December 5, 2008, Peru filed its Original Complaint. Notwithstanding the allegations contained therein which outlined the central role this forum served in making Yale's Bingham-led adventures possible, on March 4, 2009, Yale moved to dismiss the Complaint for lack of personal jurisdiction, stating that "**the District of Columbia has nothing to do with this dispute**." (Yale Mtn., Dkt. 10, at 2) (emphasis added). Yale asserted that specific jurisdiction was lacking and that Peru had failed to plead facts connecting Yale to the District of Columbia.

Accordingly, on April 20, 2009, Peru filed its First Amended Complaint (the "Amended Complaint"), this time presenting the Court with additional, substantial and more detailed allegations, supported by numerous pieces of correspondence, all of which demonstrate the District of Columbia's central connection to this dispute. Despite this overwhelming evidence, Yale now chooses to dismiss these overwhelming facts as "smoke and mirrors" (Yale Mtn., Dkt. 18-3, at 17) and "a sideshow" (Id. at 1).

As demonstrated below, however, it is plainly evident that Washington, D.C. was the only gateway through which Yale's expeditions in Peru could have occurred, that Yale knew this at the time and aggressively engaged in a series of discussions and meetings in Washington, D.C., and as such, Yale purposefully directed its activities at this forum to make the expeditions possible. Indeed, but for its activities undertaken in this forum, the expeditions would never have occurred, and Peru would not have suffered the injuries for which it now seeks redress. Similarly, it is also equally clear that the injuries and claims which are now before this court "arise out of or are related to" Yale's conduct in this forum, and the facts presented herein clearly demonstrate that specific jurisdiction is plainly warranted.

Additionally, Yale completely disregards its substantial, present-day activities in Washington, D.C., which form the basis for the Court's general jurisdiction over Yale. In fact, it incredibly asserts that it carries on no activities here that justify the exercise of general jurisdiction over it. As described below, Yale's statements are belied by even the most cursory examination of information in the public domain which, in and of itself, reveals a systematic and continuous level of activities by Yale in this forum.

In light of the foregoing, the Court should entirely reject Yale's Motion to Dismiss due to its lack of merit, Yale's Motion should be denied, and Yale should be directed to immediately respond to Plaintiff's First Amended Complaint.

## II.    THIS COURT HAS JURISDICTION OVER YALE.

To prevail on a motion to dismiss for lack of personal jurisdiction, a plaintiff need only make a *prima facie* showing of pertinent jurisdictional facts. Edmond v. United States Postal Serv. Gen. Counsel, 949 F.2d 214, 424 (D.C.Cir. 1991). Moreover, any "factual discrepancies appearing in the record must be resolved in favor of the plaintiff." Crane v. New York Zoological Soc., 894 F.2d 454, 456 (D.C.Cir. 1990).

To determine whether a court has personal jurisdiction over a defendant, it must first "determine whether jurisdiction over a party is proper under the applicable long-arm statute" and then whether the exercise of jurisdiction "accords with the demands of due process." Cohane v. Arpeja-California, Inc., 385 A.2d 153, 158 (D.C. 1978). Additionally, a court may find jurisdiction over a defendant through either "specific" or "general" jurisdiction. Arista Records, Inc. v. Sakfield Holding Co. S.L., 314 F. Supp. 2d 27, 31 (D.D.C. 2004).

To establish specific jurisdiction, a plaintiff must show that: (1) the defendant transacted business in the District; (2) the claim arose from the business transacted in the District; and (3) the defendant had minimum contacts with the district such that the Court's exercise of personal jurisdiction would not offend "traditional notions of fair play and substantial justice." Schwartz v. CDI Japan, Ltd., 938 F.Supp. 1, 4-5 (D.D.C. 1996)(citing Dooley v. United Technologies

_Corp._, 786 F.Supp. 65 (D.D.C. 1992)(quoting _International Shoe v. Washington_, 326 U.S. 310, 316 (1945)). District of Columbia courts have long recognized that a court may assert specific jurisdiction whenever a defendant has purposely directed its activities at residents of the forum and the resulting claims "arise out of or relate to" those activities. _Shoppers Food Warehouse v. Moreno_, 746 A.2d 320, 331 (D.C. 2000)(citing _Burger King Corp. v. Rudzewicz_, 471 U.S. 462, 472-73 (1985); _Keaton v. Hustler Magazine, Inc._, 465 U.S. 770 (1984); _Helicopteros Nacionales de Columbia, S.A. v. Hall_, 466 U.S. 408, 414 (1984)). Importantly, it is equally well settled in the District of Columbia that "**[e]ven a small amount of in-jurisdiction business activity is generally enough to permit the conclusion that a nonresident defendant has transacted business here**." _Environmental Research Int'l, Inc. v. Lockwood Greene Engineers, Inc._, 355 A.2d 808, 811 (D.C. 1976) (emphasis added).

Alternatively, general jurisdiction is appropriately found where the defendant is deemed to be "doing business" in the District of Columbia. The test for general jurisdiction is whether the defendant's contacts with the forum are "continuous and systematic." _Helicopteros_, 466 U.S. at 415.

As discussed below, both specific and general jurisdiction over Yale are appropriate in this matter.

A.      **This Court Has Specific Jurisdiction Over Yale**

Section 13-423 of the District of Columbia Code authorizes any District of Columbia court to exercise jurisdiction over a defendant based on the defendant's conduct within this forum. More particularly, § 13-423 states, in pertinent part:

> (a) A District of Columbia court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a claim for relief arising from the person's—
>
>      (1) transacting any business in the District of Columbia;
>
> (b) When jurisdiction over a person is based solely upon this section, only a claim for relief arising from acts enumerated in this section may be asserted against him.

D.C. Code § 13-423.

As discussed below, it is plainly evident that Yale, through its planning, organization, financing and implementation of the expeditions: (1) directed activities at this forum and (2) that Peru's claims arise from or relate to those activities. As such, specific jurisdiction is warranted.

### 1. Yale Purposefully Directed Its Activities At This Forum

As outlined in the Amended Complaint, and demonstrated by the numerous documents attached thereto, Washington, D.C. served as the central forum through which Yale's expeditions were made possible. That this is true is further supported by the additional documents filed herewith (See Declaration of Christina E. Ponig, attached hereto as Exhibit A and Attachments thereto and Declaration of Terry Garcia, Executive Vice President of Missions Programs of the National Geographic Society ("NGS"), (the "Garcia Declaration"), attached hereto as Exhibit B and filed herewith.) The Amended Complaint, the voluminous record evidence, and the Garcia Declaration demonstrate one central point: Yale would not have been able to plan, organize and undertake the expeditions, and ultimately improperly retain Peru's property without its efforts and actions directed at this forum.

For the Court's convenience, Peru outlines below Yale's contacts with and activities in the District of Columbia, as organized by expedition. As the Court will see, there are three expeditions that Peru allowed Yale to conduct. Yale's contacts with Washington, D.C. regarding the expeditions are numerous and categorized by (a) contacts, both pre- and post-expeditions, with NGS regarding the co-sponsorship, the funding, and/or organization of the expedition and (b) contacts with the United States Government.

### a. The 1911 Expedition

In its instant motion, Yale pointed to the fact that, on February, 28, 1911, when Bingham wrote the Peruvian Ambassador in Washington, D.C., explaining his "proposed scientific expedition to Peru" and asked for any help that the Ambassador could provide "to further the

success of this project," he apparently added a post-script that "I have just received a letter from [the President of Peru] approving my plan." Ponig Cert., Exh. A, at para. 4.

Yale seems to draw from this scribbled note that the University did not actually need the Ambassador's assistance since it already had secured approval, so, as Yale argues, this D.C. connection was of no import and therefore cannot stand as a basis for D.C. jurisdiction. Putting aside why Bingham took such apparently opposing positions in the same letter, even if Yale's contention about the level of assistance that the D.C.-based Ambassador provided regarding the 1911 expedition (the one expedition where <u>Bingham did not seek to either excavate nor export any artifacts</u>) is accurate, as the record below clearly demonstrates, Yale's reliance on Washington, D.C. as the gateway for its subsequent expeditions in 1912 and 1916 where extensive excavations and exportation of artifacts were to be central, is inescapable.

Following the Peruvian President's approval of Bingham's plans, Bingham arrived at Machu Picchu in July 1911. Upon information and belief, Yale, entirely or in substantial part, funded the 1911 expedition. Upon information and belief, Bingham knew that he and Yale were was prohibited during the 1911 expedition from excavating or exporting artifacts from any site in Peru based on Peruvian law then in effect. He also knew that any future expeditions to Peru would first require a change in Peruvian law to enable him to excavate and export artifacts from Machu Pichu and surrounding areas. As will be seen below, due to the restrictions of then current Peruvian law, Bingham felt compelled to reach out to NGS and others in Washington, D.C. to enable him and Yale to conduct expeditions that would permit excavation and exportation of Artifacts from Peru because Yale was unable to secure such permission on its own accord.

### b. The 1912 Expedition

On January 18, 1912, Bingham was invited by Grosvenor to travel to Washington, D.C., to meet with the NGS Research Committee, the entity responsible for allocating NGS funds to support geographic exploration. Exh. A, paras. 5, 6. Bingham and Grosvenor had become acquainted a few years earlier, in 1909, when Bingham's work in South America had caught the attention of Grosvenor, who invited Bingham to publish an article on his South American travels in Geographic Magazine. Exh. A, paras. 7, 8, 9, 10.

The purpose for Grosvenor's latest invitation to Bingham was to meet with the NGS Research Committee, which had apparently increased its exploration work. Grosvenor thought that it would be beneficial for the Committee and Bingham to know each other. Exh. A, para. 5.

On February 9, 1912, Bingham spoke to NGS in Washington, D.C. – at the invitation of Grosvenor – about the results of his 1911 expedition to Peru. Exh. A, paras. 11-14. On February 13, 1912, Bingham wrote Grosvenor, thanking him for his hospitality during his visit to Washington, D.C., as well as for his "expressed willingness to see what you could do in helping forward another expedition to Peru." Exh. A, para. 15. Bingham also relayed that he was not sure when his next expedition would be but that he would be in contact with Grosvenor "as soon as [he was] ready to lead another expedition to the land of the Incas." Id.

As it turns out, as discussed below in Section A.1(b)(3), Bingham was already planning his return to Peru and was laying the groundwork for another expedition, one that would allow him to excavate as well as export materials out of the country. *See infra* Section A.1(b)(3).

### (1) Financial Support from NGS, which at all times relevant herein, was located and doing business in Washington, D.C.

NGS enthusiastically supported Bingham's plans for another expedition, as evidenced by NGS sponsoring the 1912 expedition and contributing at least $10,000 to the Bingham-led effort. Exh. A, para. 16. NGS's financial support was crucial to the expedition. So crucial was NGS's funding, in fact, that, when it appeared that NGS would not sponsor the expedition because it was not sufficiently geographic in nature (Exh. A, paras. 17, 18), Bingham rushed to

Washington, D.C. at Grosvenor's request to meet with NGS and convince the Society of the expedition's merit. Exh. A, paras. 19, 20, 21. He advised Grosvenor, "I shall plan to stay in Washington as long as you need me. . . ." Exh. A, para. 22. Bingham's trip to the District succeeded: soon thereafter, Grosvenor advised Bingham that NGS decided to support the expedition. Exh. A, para. 23.[2]

## (2) Logistical Support from NGS

NGS's support of the 1912 expedition was not only financial but was also critical to providing the necessary legitimacy in the eyes of Peru, and logistical support needed to make the expeditions a reality. As an initial matter, Bingham's requested a stamp of approval from NGS and, to this end, requested that Grosvenor provide:

> ***[a] letter from [NGS officials] addressed to me and stating your interest in the work and approval of our plans [which] would be very helpful. . .*** The stronger the credentials which you can give me, the better able I shall be to persuade any who stand in the way of exploration and excavation that our object is scientific and not commercial (emphasis added).

Exh. A, para. 24. Upon information and belief, NGS did so.

NGS collaborated with Bingham on all aspects of planning the expedition. (See id. para. 25) It also helped secure staff and instruments for the expedition (Id. paras. 26-37, 57) and even kept in contact with Bingham during the expedition to ensure that the trip was proceeding as hoped. For example, on July 11, 1912, Bingham reported to NGS from Cuzco about the expedition's progress, including the discovery of "bones and sherds [sic] . . . in the Cuzco Valley together with several undescribed ruins of considerable importance. . . ." Exh. A, para. 38. Later that month, Bingham asked Grosvenor to send several people in Lima complimentary copies of the NGS Magazine. Among Bingham's list of requested recipients were the President of Peru and Bingham's contact for W.R. Grace & Co. in Lima, Peru. Exh. A, para. 39.

---

2      For more correspondence on the critical nature of NGS's funding of the 1912 expedition, see Exh. A, paras. 26, 42, 43, 45, 56, and 68.

NGS's support and participation was memorialized in agreements with Yale and Peru. In May 1912, NGS and Yale entered into a Memorandum of Agreement signed in Washington, D.C., by Grosvenor on behalf of NGS, as the President and the Secretary of NGS, Bingham on behalf of Yale, and President Hadley of Yale. Exh. A., para. 40. NGS agreed, among other things, to assist in funding a second expedition to Peru as well as in supplying the instruments for the expedition.[3] On May 3, 1912, Bingham confirmed receipt of NGS's signed agreement and, in the same letter, relayed to Grosvenor that he would be in Washington, D.C. a few days later "to see at that time the Acting Secretary of State and President Woodward of the Carnegie Institution, in addition to my new partners in Peruvian exploration." Exh. A, para. 41.[4][5]

Upon information and belief, NGS and Yale later entered into a working agreement with Peru to allow the exploration of the Incan ruins at Machu Picchu and the surrounding areas as well as to export artifacts for a limited time for study in the United States.

Bingham's report on the expedition was important to the NGS Magazine. NGS planned to devote an entire issue to the 1912 expedition, making that issue much larger than normal to accommodate additional photographs. Exh. A, para. 50. Bingham later asked Grosvenor if he had sent leather-bound copies of the article to the President of Peru, as "***[i]t might lubricate the wheels for our next expedition, especially if it were stamped in gold letters that it was presented to him by the National Geographic Society and Yale University.***" Exh. A, paras. 51, 52 (emphasis added).

So thrilled with Bingham's work was Grosvenor that he advised Bingham, "If you have any plans which you personally expect to take charge of, say in 1914, or after your present reports are completed, I wish you would advise me at your early convenience. ***I do not think the***

---

3    The U.S. War Department furnished instruments for the 1912 expedition as well. See Exh. A, para. 86.

4    Indeed, Bingham acknowledged the importance of maintaining the profile of the expedition in the Washington, D.C. press. See Exh. A, para. 44 (enclosing a press release, "in case you want to give something to the Washington papers").

5    Bingham made trips to Washington, D.C. following the expedition to speak on the 1912 expedition. See, e.g., Exh. A, paras. 46-49.

***Society could make wiser appropriations of its research money than backing your***
***expeditions***." Exh. A, para. 53 (emphasis added).[6]

(3)       **Support from the United States Government**

Bingham also solicited the assistance of the highest levels of the United States
Government – no less than the President of the United States, William Howard Taft – to ensure
that the 1912 expedition could take place. A.C., Dkt. 15, para. 27. Bingham, however, was
aware that exploration and excavation of Peru would be illegal under Peruvian law. Specifically,
in his letter to President Taft, Bingham recognized that:

> [t]he Peruvian government, in order to protect its ancient
> monuments for [sic] devastation chiefly by local treasure hunters,
> has passed a law decreeing that all ruins and ancient cities are the
> property of the Peruvian government, and must not be excavated
> by private persons. ***A law has also been passed forbidding the***
> ***exportation from the country of Peruvian antiquities.*** (emphasis
> added).

Exh. A, para. 58. Bingham, therefore, sought the President's help in obtaining a special
concession from Peru that would allow Yale to conduct the expedition as well as excavate and
export the artifacts to the United States. On February 12, 1912, at President Taft's request,
Bingham wrote the President, explaining his proposal for an expedition to Peru and ways that the
U.S. Government could assist him in securing a fifteen (15) to twenty-year (20) concession from
Peru to allow excavation and exportation of artifacts to the United States. Id.

President Taft obliged, and on February 15, 1912, the Secretary to President Taft wrote
then-Acting Secretary of State, Huntington Wilson, relaying the President's desire for Wilson to
make an informal request to the Peruvian Government to allow Bingham's expedition. Exh. A,
para. 59. The State Department did not merely make an isolated request of Peru, but rather
remained involved until the concession was secured. Exh. A, paras. 60, 25, 26, 28, The
President himself later wrote H. Clay Howard, the American Ambassador in Lima, Peru, to

---

6      For similar examples of correspondence between NGS and Bingham on NGS's expressed
support for Bingham's work, see also Exhibit A, paras. 53, 54, 55, and 67.

direct that he "render all proper support to Doctor Bingham and the other representatives of Yale University in their undertaking . . . ." Exh. A, para. 61.

Upon information and belief, on October 31, 1912, in response to a request by the United States Government – which acted at the prompting of Yale – the Peruvian Government issued an executive order ("the Third Decree"). The Third Decree allowed Bingham, Yale, and NGS to conduct an expedition to Peru for the purpose of excavating and exporting artifacts to the United States. The Third Decree, however, subjected this expedition to certain conditions – most notably, that all artifacts – including those removed previously from Peru in Bingham's earlier expeditions – would be returned upon Peru's demand. Yale agreed to these conditions. The assistance of the United States Government was critical to obtaining this concession from Peru. Bingham, in fact, would later observe that President Taft's "official help" was "of a most important nature." Exh. A, para. 62.

### c. The 1914-1915 Expedition

After the 1912 expedition, Bingham stated that he did not intend to return to Peru until 1915. Exh. A, para. 63. In early 1914, however, he accelerated his plans to return after he learned that two earthquakes had occurred in the area explored in both his 1911 and 1912 expeditions. Exh. A, para. 64. Bingham again sought help from Grosvenor in securing NGS's financial support as well as permission from the Peruvian Government to conduct yet another expedition. Id.

As with the 1912 expedition, Bingham traveled to Washington, D.C., to secure the support of the NGS Research Committee. Exh. A, para. 65. Since the NGS Research Committee controlled expedition funding, Bingham met with them in Washington, D.C. to secure funding for this expedition. Id.; see also Exh. A, para. 66. Bingham also made numerous trips to this forum to secure other support from various individuals and institutions there as well as to meet with NGS to finalize plans for the expedition.[7,8]

---

7    Exh. A, paras. 69, 70, 74, 79-82, 103.

### (1)     Financial Support from NGS

Like the 1912 expedition, NGS again gave tremendous financial support – upon information and belief, at least $20,000 – to the 1914-1915 Bingham-led expedition.  Exh. A, paras. 69, 73, 74, 75, 76, 94, 95, 96, 100-102, 106, 108, 110, 111, 113, 114.  Also like the 1912 expedition, NGS's funding was critical to Bingham's ability to undertake the expedition.

### (2)     Logistical Support from NGS

NGS assisted Bingham with all aspects of preparation and execution of the 1914-1915 expedition, as it had done for the 1912 expedition.  NGS reviewed the plans for and progress of the expedition.  Exh. A, paras. 76, 90, 109110.  Grosvenor lent immense assistance to Bingham in attempting to find a suitable topographer, including calling on his contacts at the Coast Artillery.  Exh. A, para. 96, 97-99.  He also helped find a naturalist and botanist for the 1915 portion of the expedition.  Exh. A, para. 104, 105, 107.

NGS also helped secure the instruments for the expedition, including the use of a detached service chest from the U.S. War Department in Washington, D.C.  Exh. A, para. 86.[9] The War Department had loaned a similar chest to Bingham's expedition in 1911 and 1912.  Id. Bingham had previously made the request through President Taft but thought that it would be better if the request came through Grosvenor as Director of NGS.  Id.  Bingham routinely prevailed upon NGS to intercede with Governmental entities to obtain concessions he would have been unable to arrange absent NGS's institutional support.

---

8    Bingham was not the only member of the expedition team traveling to Washington, D.C., in preparation for the expedition.  On April 14, 1914, Bingham advised Grosvenor that Ellwood C. Erdis, the Chief Engineer of the Expedition, was going to Washington, D.C., to meet with the curator of animals at the United States National Museum8 "to learn how they want the things packed and sent home."  Exh. A, para. 71; see also id. para. 72. Erdis planned to spend nearly a year and a half in the field on the expedition, and had arranged to house animals collected in Peru at National Museum facilities.  The National Museum would also house specimens collected by the botanists on the expedition.  Exh. A, para. 74.
9    For correspondence on other instruments that NGS helped secure, see Exhibit A, paragraphs 77, 78, 89, and 112.

NGS also intervened with Peruvian authorities to secure permission for the 1914-1915 expedition. At Bingham's request, NGS, in conjunction with Yale, sent a formal application to the Peruvian Ambassador, "requesting him to secure the approval of his government to this project." Exh. A, para. 84. Bingham further asked Grosvenor to make a personal visit to the Peruvian Ambassador in Washington, D.C. and ask him to telegraph Lima directly "that [NGS] and Yale University would like to send an exploring expedition to Peru this year, and would like to be assured that it will be received on the usual terms accorded to properly accredited scientific expeditions." Id.; see also Exh. A, para. 85. On March 10, 1914, Grosvenor confirmed that he had made the request with the Peruvian Ambassador about the 1914-1915 expedition and that "everything is all right." Exh. A, para. 87. Peru had approved the request.[10]

As with the 1912 expedition, NGS memorialized its support for and participation in the 1914-1915 expedition by Agreement. Exh. A, paras. 83, 88, 91. In March 1914, NGS and Yale entered into a "Memorandum of Agreement for the Peruvian Expedition of 1914-15 under the Auspices of Yale University and the National Geographic Society" in which NGS agreed to support and co-sponsor Bingham's third expedition. Exh A, para. 93. Grosvenor again signed the Agreement for NGS in Washington, D.C., and sent the signed agreement to Yale for its signature. When Grosvenor received the fully executed agreement from Yale University, he wrote Yale President Arthur T. Hadley, relaying that "it is with great pleasure that our Society co-operates again with Yale University in Dr. Bingham's work." Exh. A, para. 94.

### 2. Peru's Injuries Arise Out Of Or Relate To Yale's Activities In This Forum

It is clear from the above that Yale, in making its expeditions a reality, not only "transacted business" in this forum within the meaning of the District's long-arm statute, but it could never have achieved its twin goals of being permitted to legally excavate and export artifacts from Machu Pichu without the actions of those it sought assistance from in Washington,

---

[10] NGS also assisted Yale in maintaining ties with people of influence in Lima. See Exh. A,. para. 92.

D.C..  It is equally clear that Peru's claims before this Court "arise out of" or "relate to" Yale's activities in this regard.[11]

This requirement that a claim "arise out of" or "relate to" activities in this forum is interpreted broadly.  For example, the District of Columbia Court of Appeals has long characterized Section 13-423(b)'s requirement as simply "meant to prevent the assertion of claims in the forum state that do not bear **some** relationship to the acts of the forum state relied upon to confer jurisdiction." Cohane, 385 A.2d at 158 (emphasis added).  In fact, it is hornbook law in the District that once "the claim is related to acts in the District, § 13-423 **does not require that the scope of the claim be limited to activity within this jurisdiction**." Id. at 158-59 (emphasis added) (citation omitted); Chrysler Corp. v. General Motors Corp., 589 F.Supp. 1182, 1205 (D.D.C. 1984)(noting, "It is clear, however, that once the claim is related to acts in the District, the long arm statute does not require that the scope of the claim be limited to activity within this jurisdiction.").  Put another way, it is of no jurisdictional import whether activity occurred outside of the District of Columbia for which a plaintiff seeks relief if the claim itself is related in any way to acts which occurred in the District.  See Shoppers Food Warehouse, 746 A.2d at 326.

As discussed below, each and every count asserted in Peru's Amended Complaint is related to Yale's activities in this forum, namely, the organization and implementation of the expeditions which enabled Yale to acquire the artifacts.  Indeed, the relationship is so connected to this forum that the expeditions would never have occurred, and Peru would never have been divested of its property, but for Yale's activities in the District of Columbia.

### a.  Violation of Peruvian Law, Replevin, Wrongful Retention, Conversion, and Related Claims for Civil Conspiracy

Yale asserts that specific jurisdiction over it is lacking because (a) the various Peruvian laws allowing Bingham's expeditions were enacted "by Peru, in Peru" (Dkt. 18-3, at 5), (b) the

---

11      Section 13-423(b) states: "[w]hen jurisdiction over a person is based solely upon [Section 13-423], only a claim for relief arising from acts enumerated in this section may be asserted against him."

Artifacts were excavated in Peru, (c) the Artifacts were shipped to Connecticut, and (d) Artifacts are currently in the custody of Peru in Connecticut.  Id.  For these reasons, argues Yale, there is no connection between the District of Columbia and Yale, and this Court's exercise of specific jurisdiction over Yale would be improper.  Id.

In putting forth this argument, however, Yale misstates the law.  Indeed, under the law of the District of Columbia, Peru's claims before this Court need only bear "**some relationship**" to the acts in the forum relied upon to confer jurisdiction.  Cohane**,** 385 A.2d at 158 (emphasis added).   Here, there is more than simply "some" relationship between Yale's activities and this forum, as stated, but for Yale's activities in the District, which included repeated trips and exchanges of correspondence with NGS and the Peruvian Ambassador to secure support for and plan the expeditions, the Bingham-led expeditions would not have occurred.  Accordingly, specific jurisdiction over Yale is proper.

### b.     Breach of Fiduciary Duty, Fraud, Fraudulent Misrepresentation, and Related Claims for Civil Conspiracy

Yale's arguments regarding Peru's claims for breach of fiduciary duty, fraud, fraudulent misrepresentation, and the related claims for civil conspiracy are similarly unavailing.  Yale argues that the asserted wrongs – namely, Yale's breach of trust, including its failure to conduct studies as agreed as well as the failure to return the artifacts – occurred in Connecticut and that the harm of Yale's conduct "was felt in Peru."  Dkt. 18-3, at 17.  Yale asserts that no connection between Peru's claims and the District of Columbia exists, making the exercise of specific jurisdiction over Yale improper.  Id.

Yale's argument again disregards the plain language of Section 13-423 and the well-established law of the District of Columbia.  Were it not for Yale's activities in the District of Columbia, the participation of NGS, and the diplomatic efforts of the United States Government at the behest of Yale, Yale never would have garnered the support that it needed for the Bingham-led expeditions, the expeditions would not have occurred, and Peru would not have

been deprived of its Artifacts. Yale's activities and transaction of business in this District concerning the expeditions absolutely relate to Peru's claims against Yale. Under Section 13-423 and the case law interpreting this statute, specific jurisdiction over Yale based on these claims is proper.

### c. Breach of Contract and Breach of Bailment Contract

Yale devotes almost one-half of its brief to arguing that no specific jurisdiction exists over Yale based on Peru's contract claims. Specifically, Yale argues that (a) no contract exists because Peru has not appended a signed contract to its Amended Complaint[12] (Dkt. 18-3 at 7); (b) Peru confuses the various laws enacted for binding contracts (Id.); (c) the parties to the alleged contracts are residents of Peru and Connecticut, not Washington, D.C. (Id. at 8); (d) there is no substantial connection to Washington, D.C., as the alleged parties to the agreements were non-residents, the Complaint does not support that negotiations occurred within Washington, D.C., the contracts were entered into outside the District, and the performance of the contracts occurred outside Washington, D.C., and (e) the alleged breach of the contracts occurred in Connecticut. (Dkt. 18-3, at 8).

Yale further asserts that the only contacts on which Peru's contract claims could be based are Bingham's, NGS's, and the U.S. Government's contacts with the Peruvian Ambassador in D.C. and that these contacts do not support specific jurisdiction over Yale in D.C. because they are too few in number, they sought the Ambassador's help in merely relaying a message to Lima and were therefore not negotiations, and contacts with U.S. government officials cannot suffice to establish jurisdiction in D.C. based on the "government contacts" doctrine. Id. at 9-11.

Finally, Yale states that all of the important negotiations occurred in Lima (Dkt. 18-3, at 13) and that NGS's involvement in the negotiations with Peru was marginal at best (Dkt. 18-3, at 11-12 and n.8). Yale even argues that NGS's involvement cannot impose specific jurisdiction

---

12 Yale's own exhibit actually refers to a "contract" between Peru and Yale. Exhibit B to the Freiman Declaration, Dkt. 18-4.

over Yale in D.C. because "Peru did not even know that NGS was located in D.C." Id. at 15. Yale bases this argument on one line in the Fourth Decree, referencing NGS's headquarters as New York.

Yale's arguments are without merit. First, for the purposes of specific jurisdiction, it does not matter what *Peru's* knowledge about NGS was. It matters only what *Yale* knew about NGS. D.C Code §13-423(a)(1); Shoppers Food Warehouse, 746 A.2d at 331. As the factual record referenced herein plainly establishes, Yale and Bingham were well aware of the need to garner and maintain the support of individuals and institutions located in the District of Columbia, most notably NGS and the Peruvian Ambassador. Thus, Washington, D.C. – as the location of the headquarters of NGS, the Peruvian Embassy, and the United States Government – was of central importance to the Bingham-led expeditions.

Contrary to Yale's attempts to marginalize NGS's involvement, NGS was not a passive participant in the Bingham-led expeditions. It was a key player and co-sponsor, whose funding, oversight, involvement, prestige, and support made possible the expeditions. Yale and Bingham knew this fact, as evidenced by the numerous exchanges of correspondence between Bingham and NGS as well as Bingham's frequent trips to Washington, D.C. to secure and maintain NGS's support for the expeditions. Next, Yale, Bingham, and NGS knew that they had to win the support of the Peruvian Ambassador in D.C. to secure the permission from the Peruvian President for the expeditions. If the Peruvian Ambassador did support the expeditions, it was unlikely that Yale and NGS could obtain permission from the Peruvian Government in Lima for Bingham's work. Exh. A, para. 61. Thus, the U.S. Government and NGS were critical liaisons on Yale's behalf to secure Peru's concessions allowing the expeditions.

In addition, in stating that only Yale and Peru were parties to the working agreements for the expeditions, Yale overlooks a key fact: NGS was also a party to the working agreements with Peru and Yale for the 1912 and the 1914-1915 expeditions. NGS negotiated the contracts in Washington, D.C., it signed them in D.C., and it performed its obligations under the agreements in D.C.

The factual record establishes the District of Columbia's clear connection to Peru's contract claims, and Yale's statements to the contrary are belied by the evidence.

### d. Unjust Enrichment and Claims for Accounting

Finally, Yale asserts Peru's claims for unjust enrichment and for an accounting do not create specific jurisdiction over Yale because the benefit of excavating and exporting the artifacts was conferred upon "Yale, a Connecticut university, in Peru." Dkt. 18-3, at 6. Yale further asserts that the touring exhibit of the Artifacts did not pass through D.C., so D.C. has no connection to the unjust enrichment claim. Yale also states that D.C. has no connection to Peru's claim for accounting because the accounting will take place in Connecticut "for objects residing in Connecticut." Id.

Yale's arguments on Peru's claims fail for the same reason as its arguments on Peru's other claims fail: but for Yale's activities in D.C. and the support it received from institutions and individuals located in D.C., the expeditions would not have taken place, and Yale would not wrongfully have Peru's Artifacts in its possession from which it has wrongfully profited and been unjustly enriched. Yale elected to transact business in Washington, D.C., and Peru's claims arise from and relate to those activities." Cohane, 746 A.2d at 326 (emphasis added) (citation omitted); Chrysler Corp., 589 F.Supp. at 1205. Specific jurisdiction over Yale is, therefore, proper.

## B. This Court Has General Jurisdiction Over Yale.

In addition to the fact that this Court has specific jurisdiction over Peru's claims in this matter, as discussed above, Plaintiff submits that Yale is even more challenged to demonstrate that general jurisdiction over it is lacking. District of Columbia law permits courts to exercise general jurisdiction over a nonresident defendant if that defendant is "doing business" in the District. AMAF Int'l Corp. v. Ralston Purina Co., 428 A.2d 849, 850 (D.C. 1981); Helicopteros, 466 U.S. at 415 n. 9. The test for general jurisdiction is whether the defendant contacts with the District were "continuous and systematic." Helicopteros, 466 U.S. at 415.

## 1. *Yale's Contacts with this Forum Are Regular and Continuous.*

Notwithstanding Yale's contention that it has no systematic contacts with this forum, a simple Internet search in the public domain plainly establishes that Yale's contacts with the District of Columbia are continuous, systematic and numerous. Such contacts plainly warrant the exercise of this Court's general jurisdiction over Yale.

For example, Yale itself devotes an entire website (www.yaleinwashington.com) to cataloging and promoting its regular and systematic contacts with Washington, D.C. Exh. A., para. 128. Yale also has created and maintains the Yale Club of Washington, located at 4227 46th Street, N.W., Washington, D.C. 20016. Exh. A, para. 129. This organization, by Yale's own admission, exists for the purpose of promoting the welfare of Yale and "spread[ing] its influence" in Washington DC, as well as performing and supporting other continuous and systematic activities, such as "bring[ing] a knowledge of Yale to potential college students" in the District of Columbia. Id. Even a cursory Google search of Yale's other activities within this forum yields a multitude of other regular and systematic contacts. These include, for example:

- Yale's annual "Yale in Washington Program" – an annual summer program for Yale undergraduates in Washington, DC;

- According to reports filed with the United States House of Representatives and Senate, Yale spends between $150,000 and $500,000 annually in promoting its interests through lobbying activities;

- Upon information and belief, admissions personnel travel annually to this forum to recruit residents of the District;

- Yale runs what it terms the "India-Yale Parliamentary Leadership Program" whereby it brings members of India's Parliament and Yale's faculty to this forum;

- Yale and the National Gallery of Art coordinate exhibits including last year's "Colorful Impressions: The Printmaking Revolution in Eighteenth-Centruy France." This exhibit apparently included coordinated activities on Yale's campus and at the National Gallery of Art in the District;

- Yale loaned to the Phillips Collection in Washington an exhibit entitled "The Societe Anonyme: Modernism for America." This exhibition was supported by the National Endowment for the Arts, also located in Washington.;

- Yale Law School hosts an annual dinner at the National Press Club;

- Yale hosts an annual Law and Globalization seminar in Washington, most recently held in December 2008; and

- Yale hosts job fairs in the District.

Exh. A, paras. 115-123.

While there are no hard and fast rules as to what constitutes "doing business" for general jurisdiction purposes under §13-334, District of Columbia courts regularly recognize that general jurisdiction is appropriate under circumstances where defendants made less-forceful business efforts in Washington, D.C. than here. See, e.g., Ross v. Product Development Corp., 736 F.Supp. 285, 290 (D.D.C. 1989) (defendant maintained continuous and systematic presence by distributing printed matter in District of Columbia); Arista Records, 314 F.Supp.2d at 33-35 (active solicitation marketing technique used to enter into sales agreements over the internet with residents of District of Columbia was continuous and systematic); AMAF Int'l, 428 A.2d at 851 (defendant had been doing business in District for nearly 25 years and advertised products in district even though type of business corporation transacted in district was unrelated to subject matter of contract involved lawsuit and corporation did not initiate that contract); Price v. Griffin, 359 A.2d 582 (D.C. Cir. 1976) (foreign corporation was "doing business" within District of Columbia where corporation had business office in District, had sold stock there, and had conducted some of its negotiations for appointment to its boards of directors and gave patent licensing agreement in District). Given Yale's continuous and systematic presence in this jurisdiction as described above, general jurisdiction over Yale is appropriate as a matter of law.[13]

### 2. Because Yale Told Peru That It Would Accept Service In Its "Customary Manner," Namely, By Accepting Service In Connecticut, Yale Cannot Now Assert The Failure To Be Served In This Forum As A Defense To General Jurisdiction.

Yale next contends that general jurisdiction cannot be found because it was not served in this forum. What Yale does not disclose, however, is that it was asked by counsel for Plaintiff if

---

[13] To the extent that the Court requires even more examples of Yale's continuous and systematic contacts with the District of Columbia, Peru respectfully submits that this issue is the proper subject of jurisdictional discovery and hereby requests the Court grant such discovery if more information is required.

it would waive service of process and its General Counsel, Dorothy Robinson, in lieu of waiving service specifically directed that Yale be served at the University's office in Connecticut, which she added was their "customary manner."[14] Exh. C, para. 3.

Peru obliged and served Yale as instructed by its General Counsel at her offices in New Haven, Connecticut. Plaintiff contends that it would be patently inequitable to permit Yale to now be allowed to avoid its own directive actions regarding service by permitting it to successfully claim that it should avoid the jurisdiction of the Court because it was not served within the confines of the District of Columbia.

Instead, Plaintiff respectfully submits that Yale should be found to have waived, or otherwise be estopped from asserting any personal jurisdiction defense based on a purported failure to serve Yale in the District. This is particularly appropriate because of Yale's request, and Peru's reasonable agreement to follow Yale's General Counsel's direction that it wanted to be served in its "customary" manner, to wit – accepting service at her offices at the University.

The Supreme Court has long recognized that because the requirement of personal jurisdiction is an individual right, it can, like other such rights, be waived or, for various other reasons, a defendant may be estopped from raising the issue. See Insurance Corp. of Ireland, LTD v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 703-05 (1982)(recognizing that the "actions of a defendant may amount to a legal submission to the jurisdiction of the court, whether voluntary or not," and holding that personal jurisdiction may be found as a sanction for failing to comply with discovery orders). See also Ausbrooks v. Ausbrooks, 493 A.2d 324, 325 (D.C. 1985)(recognizing that jurisdiction may be obtained over a defendant by consent or waiver)(citing Davis v. Davis, 305 U.S. 32 (1938)). To establish equitable estoppel in the

---

14      Moreover, putting aside the fact that Ms. Robinson is the General Counsel of Yale, Yale has litigated in this forum before, both as a plaintiff and as a defendant, and presumably knows the service requirements of this forum. See e.g. Yale v. Brito, Superior Court of the District of Columbia, Case No. 2007 CA 001731; Yale University v. Straker, Superior Court of the District of Columbia, Case No. 2008 CA 005345; Oppido v. Yale University, District Court for the District of Columbia, Case No. 89-CV-3444; Geronimo, et. al v. Yale University, District Court for the District of Columbia, 09-CV-00303.

District of Columbia, a party "must show that he changed his position prejudicially in reasonable reliance on a false representation or concealment of material fact which the party to be estopped made with the knowledge of the true facts and intent to induce the other to act." Nolan v. Nolan, 568 A.2d 479, 484 (D.C. 1990). Importantly, "it is not essential to the creation of an equitable estoppel … that the party sought to be estopped should have had an actual intent to deceive, defraud, or mislead." Cassidy v. Owen, 533 A.2d 253, 255 (D.C. 1987).

While no court in the District of Columbia appears to have addressed waiver and estoppel under circumstances similar to those found here, at least one other court has. Indeed, in Storey v. Hailey, 441 S.E.2d 602 (N.C.App. 1994), the North Carolina Court of Appeals recognized that where, like here, a defendant leads a plaintiff to believe that further service efforts would be a duplication or redundant, personal jurisdiction and service defenses are appropriately waived and the defendant should be estopped from raising them.

In Storey, the plaintiff commenced an action to recover compensation from an estate for services rendered to the decedent. Id. at 603. The defendant's counsel filed a motion for extension of time to plead, which was granted by the trial court. Id. at 604. Thereafter, counsel for both parties entered into two stipulations for additional extensions of time for the defendant to respond to the complaint. Id. After the third extension, the defendant moved to dismiss the action alleging insufficiency of process, insufficiency of service of process, lack of personal jurisdiction, and the expiration of the statute of limitations. Id. The trial court entered an order dismissing the action based on all grounds asserted by the defendant. Id. The North Carolina Court of Appeals reversed and in so doing, recognized that by and through its actions, the defendant had waived or was otherwise estopped from asserting those defenses. Id. at 604-05.

In its analysis, the court recognized that by and through the defendant's failure to raise both the service and jurisdiction defenses, and instead, extending the time to respond to the complaint:

> plaintiff was deprived of any opportunity to cure any defects in the process or in the service of process, because defendant's counsel led plaintiff's counsel to believe it was unnecessary to continue further process. Defendant, absent the additional extension of time

> stipulated to by plaintiff's counsel, would have been subject to entry of default following the expiration of the second extension on 7 May 1992. The defendant's conduct in securing extensions of time, through opposing counsel's professional courtesy, to 54 days past the date when plaintiff could have procured endorsement of the original summons or issuance of an alias and pluries summons, acts to estopp defendant from asserting these defenses. Any other result would serve only to stifle professional courtesy among members of the bar during a time when legal etiquette and professionalism are becoming more rare.

Id. at 605. The court explained that the defendant's actions "led plaintiff to believe that further service of process on defendant would be duplicatory and redundant," and the defendant's conduct lulled plaintiff into a "false sense of security." Id. at 604 (citing Tresway Aero, Inc. v. Superior Court of Los Angeles County, 487 P.2d 1211 (Cal. 1971)). As such, the Court held that any defenses based on personal jurisdiction or process were waived or estopped.

The same is true here. Indeed, Yale cannot dispute that after Peru was prepared to appropriately serve Yale based on Yale's waiver, Yale's General Counsel instead told Peru that it would accept service at her offices in New Haven, Connecticut, as was its "customary" practice. Based on Yale's representations, Peru proceeded accordingly and served Yale in the manner it had requested. Moreover, in the exchange of email regarding this issue, there is no reservation by Yale that indicated that it expected any service to be made upon it in the District of Columbia, nor does Yale in fact maintain a registered agent for service of process in the District, both of which are in line with Peru's reasonable believe that further service of process would not only be a duplication and redundant, but that such had in fact been obviated and waived by virtue of the instructions on how Yale wanted to be served through its own General Counsel.

In addition, like Storey, Peru also agreed to an extension of time in which Yale could respond to its Complaint based on the totality of circumstances. While it is of no import for waiver or estoppel purposes whether or not Yale had an intention to deceive, Peru relied on Yale's representation and accepted Yale's course of action regarding how it wanted to be served, all of which lulled Peru into a "false sense of security," and prejudiced Peru with regard to

23

serving Yale in the District of Columbia if Yale's current contention that it was improperly served is permitted to stand. Given the totality of circumstances, a finding that Yale has waived this defense, or is otherwise estopped from asserting it, is both appropriate and equitable.[15]

## C.    The Exercise Of Jurisdiction Comports With Due Process.

To establish specific jurisdiction under Section 13-423, a plaintiff must show: (1) that the defendant transacted business in the District; (2) that the claim arose from the business transacted in the District; and (3) that the defendant had minimum contacts with the district such that the Court's exercise of personal jurisdiction would not offend "traditional notions of fair play and substantial justice." Schwartz, 938 F.Supp. at 4 (citing Dooley, 786 F.Supp. at 65 (quoting International Shoe, 326 U.S. at 316)). Due process considerations relate to the third factor – whether traditional notions of fair play and substantial justice would be offended by the exercise of personal jurisdiction.

In determining whether the exercise of jurisdiction comports with traditional notions of fair play and substantial justice, a court must look to whether the "minimum contacts" between the defendant and the forum state are such that he "should reasonably anticipate being hauled into court there." Hughes v. A.H. Robbins Company, Inc., 490 A.2d 1140, 1146 (D.C.App. 1985)(citing World-Wide Volkswagon Corp. v. Woodson, 444 U.S. 286, 297 (1980)). The District of Columbia Court of Appeals recognizes that Section 13-423, like other state long-arm statutes, is coextensive with the Constitution's due process limit, and as such, District of Columbia Courts uniformly recognize that an out-of-state defendant may be haled into court if

---

15    In any event, given that its regular and systematic contacts with this forum clearly provide the basis for general jurisdiction over Yale, if the Court is inclined to allow Yale to benefit from its actions in this regard, Peru stands ready to serve any appropriate representative of Yale whenever they may be in Washington, DC through private process server. Or, if the Court so directs, pursuant to Section 29-101.99(e)(2) of the D.C. Code. Section 29-101.99(e)(2) of the District of Columbia Code provides that "[w]henever any foreign corporation does not have an agent for service of process . . . the Mayor shall be the agent for service of process for the corporation." If necessary to secure this Court's jurisdiction over this matter, Peru alternatively stands ready to serve the Mayor of DC or his designee.

the defendant has purposefully directed his activities at residents of the forum, and the litigation results from injuries that arise out of or relate to those activities.  <u>Shoppers Food Warehouse</u>, 746 A.2d at 325-26.

As discussed extensively above, there can be no question that Yale, through its actions in this forum, purposefully directed its activities at the District of Columbia.  Indeed, it had no other choice because without its substantial efforts directed at this forum, the expeditions would never have occurred.  Yale's actions were not random, fortuitous, accidental or attenuated, <u>see</u> <u>Keaton</u>, 465 U.S. at 774; nor were they too trivial to cause a consequence in the District, <u>see</u> <u>Cockrell v. Cumberland Corp.</u>, 458 A.2d 716, 717 (D.C. 1983), or "too tenuous to satisfy" the minimum contacts requirement of the Due Process clause.  See <u>Everett v. Nissan Motor Corp.</u>, 628 A.2d 106, 108 (D.C. 1993).  Rather, Yale's activities were of such a nature that they manifested a deliberate and voluntary association with the District.  There can similarly be no dispute that the injuries for which Peru now seeks redress arise from or relates to Yale's activities in this forum.  As such, the exercise of specific jurisdiction over Yale is both appropriate and warranted.

Like specific jurisdiction, the reach of general jurisdiction under District of Columbia law is also coextensive with the reach of constitutional due process.  <u>Gorman v. Ameritrade Holding Corp.</u>, 293 F.3d 506, 510 (D.C.Cir. 2002).  Under the Due Process clause, the test for general jurisdiction is whether the defendant's contacts with the forum are "continuous and systematic." <u>Helicopteros</u>, 466 U.S. at 415.

As with specific jurisdiction, it is similarly beyond dispute that Yale's contacts with this forum are "continuous and systematic."  Again, as discussed extensively above, examples include the regular and systematic contacts catalogued by Yale itself on its website (www.yaleinwashington.com), the Yale Club of Washington, the Yale in Washington Program, Yale's regular and systematic promotion of its interests through its lobbying efforts, the annual "India-Yale Parliamentary Leadership Program," Yale's regular and systematic business dealings with art institutions in the District, and Yale's other annual seminars, forums, and recruitment activities.

Yale has been "doing business' in the District for decades. Because its contacts in this regard cannot be characterized in any way other than "continuous and systematic," this court's exercise of general jurisdiction is warranted as well.

**D.    Venue is Proper.**

Venue is proper in *any* forum with a substantial connection to the Peru's claims. First of Michigan Corp. v. Bramlet, 141 F.3d 260, 263 (6th Cir. 1998). Under 28 U.S.C. § 1406(a), the decision about whether to transfer or dismiss "rests within the sound discretion of the district court." Naartex Consulting Corp v. Watt, 722 F.2d 779, 789 (D.C. Cir. 1983) (citations omitted). Moreover, in considering Yale's motion to dismiss for lack of venue[16], it is settled law in this forum that "the court accepts the plaintiff's well-plead factual allegations regarding venue as true, draws all reasonable inferences from those allegations in the plaintiff's favor, and resolves any factual conflicts in the plaintiff's favor." See Quarles v. General Investment & Dev. Co., 260 F.Supp.2d 1, 8 (D.D.C. 2003).

Here, by and through its Amended Complaint, Peru has plainly demonstrated that the material events giving rise to Peru's claims occurred either in Washington, D.C. or as Yale has claimed, in Peru. But none of these significant events occurred in Connecticut. Yale seems to conceive as venue as if it were the bookends of the case – to wit, Yale is resident in Connecticut and the Artifacts are currently in Connecticut, so regardless of the fact that virtually all, if not all, of the material events in between that arose in this case occurred in either Washington, D.C., New York, and Peru, and none of them in Connecticut, venue is proper only where Yale resides in New Haven.

---

[16] Because Yale is subject to personal jurisdiction in the District of Columbia, Yale is considered a resident of the District, and hence venue is proper in this Court. See Ironbound Partners, LLC v. Source Interlink Companies, Inc., 2005 WL 3274575, *4 (D.D.C. 2005).

Unfortunately for Yale, the law of this forum does not support Yale's myopic view of venue.  Significantly, even if events giving rise to claims asserted in the litigation occurred in another forum, Peru's choice of forum "should not be disqualified even if it is shown that activities in [another district] were more substantial or even the most substantial." Id; see also Neufeld v. Neufeld, 910 F.Supp. 977, 986 (S.D.N.Y. 1996) ("it is sufficient that a substantial part of the events occurred [here], even if a greater part of the events occurred elsewhere.").  Nor must Peru establish that every event that supports an element of a claim occurred in that district. Modaressi v. Vedadi, 441 F. Supp. 2d 51, 57 (D.D.C. 2006).  Rather, in this Circuit, the measure of the contacts giving rise to where the claim arose is "ascertained by advertence to events having operative significance in the case, and a commonsense appraisal of the implications of those events for accessibility to witnesses."  Sharp Elec. Corp. v. Hayman Cash Register Co., 655 F.2d 1228, 1229 (D.C.Cir.1981) (citing Lamont v. Haig, 590 F.2d 1124, 1134 (D.C.Cir.1978)).  Moreover, where the testimony of non-parties and evidence is outside the control of the parties, or may be available at locations where not all of the principal events in the suit occurred, the "forum court should not oppose the plaintiff's choice of venue if the activities that transpired in the forum district were not insubstantial in relation to the totality of events giving rise to the plaintiff's grievance and if the forum is generally convenient for all litigants." Id; see also Great Socialist People's Libyan Arab Jamahiriya v. Miski, 496 F.Supp.2d 137, 142 - 143 (D.D.C. 2007).

Here, the operative significance of the activities in Washington, D.C. is indisputable in relation to the totality of the events.  For example:

- Yale's expeditions at issue resulted from its numerous efforts, in Washington D.C., to draft, negotiate and execute the contracts in this case.  (See, e.g., Peru First Am. Compl., Dkt. 15, ¶¶ 44, 46, 48, 97).

- Yale's expeditions at issue resulted from its numerous efforts, in Washington, D.C., to garner staffing support. (See, e.g., Peru First Am. Compl., Dkt. 15, ¶¶ 32, 42, 76).

- Yale's expeditions at issue resulted from its numerous efforts, in Washington D.C., to garner financial support, including direct payments to the Yale University Treasurer. (See, e.g., Peru First Am. Compl., Dkt. 15, ¶¶ 32, 39, 43, 71, 75, 77, 78).

- Yale's expeditions at issue resulted from its numerous efforts, in Washington D.C., to garner diplomatic support, including communications with the Peruvian Ambassador, the Secretary of State, and even President Taft. (See, e.g., Peru First Am. Compl., Dkt. 15, ¶¶ 16, 27, 38, 56, 59, 62).

It is also important to note that Yale's statement that Peru must show venue is proper "with respect to each cause of action" is an overstatement of the law. Yale Mtn., Dkt. 18-3, at 21. When venue lies for some of plaintiff's claims, the doctrine of pendent venue may allow the court to hear the rest. Reuber v. United States, 750 F.2d 1039, 1048 (D.C. Cir. 1984). "In deciding whether to invoke pendent venue, a district court must consider the same factors that bear on economy and convenience as in deciding whether to exercise pendent jurisdiction: whether the pendent and principal claims arise out of common nucleus of operative fact; whether they present common issues of proof; [and] whether they involve the same witnesses." Id. Here, Peru has shown that each cause of action "implicate[s] a substantially identical series of events" occurring in the District of Columbia." See Elemary v. Philipp Holzmann A.G., 533 F.Supp.2d 144,150 (D.D.C. 2008) (case cited by Yale, in which district court exerted venue over RICO claims even though they arose from related rather than "common" operative facts because the claims would entail common issues of proof).

## III.   CONCLUSION

For the foregoing reasons, specific and general jurisdiction is clearly warranted and venue in Washington, D.C. is proper. Peru, therefore, respectfully requests that the Court deny Yale's Motion to Dismiss in its entirety.

Respectfully submitted,

_____/s/_____
William P. Cook
District of Columbia Bar No.: 465006
Edward S. Scheideman III
District of Columbia Bar No.:  475128
Cristina E. Antelo
District of Columbia Bar No.: 500124


DLA PIPER LLP (US)
500 Eighth Street, NW.
Washington, D.C. 20004
Tel:  (202) 799-4000
Fax: (202) 799-5000

Ileana M. Blanco
Christina E. Ponig

DLA PIPER LLP (US)
600 Travis Avenue
Suite 1700
Houston, Texas 77002
Tel: (713) 425-8400
Fax: (713) 425-8401

Attorneys for the Republic of Peru

June 15, 2009

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of June, 2009, the Response of Plaintiff Republic of

Peru to the Motion to Dismiss of Yale University was served via electronic mail to the following:

Jeffrey R. Babbin, Esq.
Wiggin and Dana LLP
One Century Tower
Post Office Box 1832
New Haven, Connecticut 06508-1832

Attorneys for Yale University


        /s/
Edward S. Scheideman