# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| REPUBLIC OF PERU, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 1:08-cv-02109 (HHK) |
| v. | ) | |
| | ) | |
| YALE UNIVERSITY, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT YALE UNIVERSITY'S REPLY IN SUPPORT OF
## MOTION TO DISMISS THE AMENDED COMPLAINT
## FOR LACK OF PERSONAL JURISDICTION AND IMPROPER VENUE

Dockets.Justia.com

# TABLE OF CONTENTS

                                                                                                          Page

Table of Authorities.................................................................................iii

INTRODUCTION.....................................................................................1

ARGUMENT..........................................................................................2

   I.    Peru has failed to establish general personal jurisdiction over Yale.........................2

      A.    Peru has failed to establish the statutory requirement for general jurisdiction..........2

      B.    Peru has failed to establish the constitutional requirements for general jurisdiction.................................................................................5

   II.    Peru has failed to establish specific personal jurisdiction over Yale.........................9

      A.    Peru asks this Court to set aside the established "substantial connection" test for specific jurisdiction in favor of a "but for" test...........................10

      B.    The claims asserted against Yale by Peru have no substantial relationship to Yale's alleged D.C. contacts..................................................16

           1.    Peru's claims do not arise from Yale's alleged D.C. contacts with the U.S. government.........................................................16

           2.    Peru's claims do not arise from Yale's alleged contacts with Peru's ambassador in D.C ...........................................17

           3.    Peru's claims do not arise from NGS' funding or related efforts in D.C......18

           4.    Peru's claims do not arise from D.C. contacts by Yale in connection with draft "working agreements."..........................................19

   III.    Venue is not proper in this District.........................................................22

CONCLUSION.......................................................................................25

# TABLE OF AUTHORITIES

## CASES

*AGS Int'l Servs. S.A. v. Newmont USA Ltd., 346 F. Supp. 2d 64 (D.D.C. 2004) ...................19

Abramaoff v. Shake Consulting, LLC, 288 F. Supp. 2d 1 (D.D.C. 2003).....................................22

AMAF International Corp. v. Ralston Purina Corp., 428 A.2d 849 (D.C. 1981) ..........................8

Antoine v. Syracuse Univ., No. CV030473601, 2003 WL 22481407 (Conn. Super. Ct.
Oct. 20, 2003) ...............................................................................................................................7

Arista Records, Inc. v. Sakfield Holding Co., S.L., 314 F. Supp. 2d 27 (D.D.C. 2004) .................8

Beachboard v. Trustees of Columbia Univ., 475 A.2d 398 (D.C. 1984)........................................9

Caribbean BC Sys v. Cable & Wireless, 148 F.3d 1080 (D.C. Cir. 1998) .....................................9

Cellutech, Inc. v. Centennial Cellular Corp., 871 F. Supp. 46 (D.D.C. 1994)..............................17

Chrysler Corp. v. General Motors Corp., 589 F. Supp. 1182 (D.D.C. 1984) ...............................12

Cohane v. Arepeja-California, Inc., 385 A.2d 153 (D.C. 1978) ...................................................12

Environmental Research Int'l, Inc. v. Lockwood Greene Engineers, Inc., 355 A.2d 808
(D.C. 1976) ................................................................................................................................12

*Everett v. Nissan Motor Corp., 628 A.2d 106 (D.C. 1993)................................................2, 3, 6

FC Investment Gp. v. IFX Markets, 529 F.3d 1087 (D.C. Cir. 2008).............................................9

Gallant v. Columbia Univ., 111 F. Supp. 2d 638 (E.D. Pa. 2000) .................................................7

Gehling v. St. George's Sch. of Med., Ltd., 773 F.2d 539 (3d Cir. 1985).......................................8

*Gonzalez v. Internacional de Elevadores, 891 A.2d 227 (D.C. 2006) .........................................2

Great Socialist People's Libyan Arab Jamahiriya v. Miski, 496 F. Supp. 2d 137 (D.D.C.
2007) ....................................................................................................................................22, 23

Hardnett v. Duquense Univ., 897 F. Supp. 920 (D. Md. 1995)......................................................7

Helicopteros Nacionales De Columbia v. Hall, 466 U.S. 408 (1984)...........................................5

*Helmer v. Doletskaya*, 290 F. Supp. 2d 61 (D.D.C. 2003) ...........................................................13

*\*Helmer v. Doletskaya*, 393 F.3d 201 (D.C. Cir. 2004) ...................................................13, 18, 22

*Jyachosky v. Winter*, No. 04-01733, 2006 WL 1805607 (D.C. June 29, 2006) ...........................23

*Kendall v. Trustees of Amherst Coll.*, No. 06-4983, 2007 WL 172396 (E.D. Pa. Jan. 18, 2007) ...................................................................................................................................7

*Kormendi/Gardner Partners v. Sur. Acquisition Venture, LLC*, 606 F. Supp. 2d 114 (D.D.C. 2009) (HHK) ...............................................................................................................9

*Lamont v. Haig*, 590 F.2d 1124 (D.C. Cir. 1978) .............................................................22, 23, 24

*Martin v. Clemson Univ.*, No. 07-536, 2007 WL 4531028 (E.D. Pa. Dec. 20, 2007) ....................7

*Modaressi v. Vedadi*, 441 F. Supp. 2d 51 (D.D.C. 2006) ..............................................................22

*Naartex Consulting Corp. v. Watt*, 722 F.2d 779 (D.C. Cir. 1983) .........................................14, 15

*Neufeld v. Neufeld*, 910 F. Supp. 977 (S.D.N.Y. 1996) ................................................................22

*Norris v. Oklahoma City Univ.*, No. C-93-1626-VRW, 1993 WL 313122 (N.D. Cal. Aug. 3, 1993), *aff'd*, 21 F.3d 1115 (9th Cir. 1994) ................................................................7

*Park v. Oxford Univ.*, 35 F. Supp. 2d 1165 (N.D. Cal. 1997), *aff'd*, 165 F.3d 917 (9th Cir. 1998) ...................................................................................................................................7

*Pierson v. St. Bonaventure Univ.*, No. 2:05 CV 0581, 2006 WL 181988 (S.D. Ohio Jan. 23, 2006) ...........................................................................................................................7

*Price v. Griffin*, 359 A.2d 582 (D.C. Cir. 1976) ...........................................................................8

*Richards v. Duke Univ.*, 480 F. Supp. 2d 222 (D.D.C. 2007), *aff'd*, No. 07-5119, 2007 U.S. App. LEXIS 30275 (D.C. Cir. Aug. 27, 2007) ...........................................................7

*Ross v. Creighton Univ.* 740 F. Supp. 1319 (N.D. Ill. 1990), *rev'd in part on other grounds*, 957 F.2d 410 (7th Cir. 1992) .............................................................................7

*Ross v. Prod. Dev. Corp.*, 736 F. Supp. 285 (1989) ......................................................................8

*\*Savage v. Bioport, Inc.*, 460 F. Supp. 2d 55 (D.D.C. 2006) ..................................................12, 13

*Scherer v. Curators of the Univ. of Missouri & Law Sch. Admission Council*, 152 F. Supp. 2d 1278 (D. Kan. 2001) ...............................................................................................8, 9

*Sharp Electronics Corp. v. Hayman Cash Register Co.*, 655 F.2d 1228 (D.C. Cir. 1981) ...........24

*\*Shoppers Food Warehouse v. Moreno*, 746 A.2d 320 (D.C. 2000)........................................9, 14

*Storey v. Hailey*, 441 S.E.2d 602 (N.C. App. 1994) .......................................................................4

*Trerotola v. Cotter*, 601 A.2d 60 (D.C. 1991) .........................................................................13, 14

## STATUTES

28 U.S.C. § 1391(a)(2)........................................................................................................................22

28 U.S.C. § 1406(a) ............................................................................................................................25

D.C. Code § 13-334(a)...................................................................................................................2, 3, 4

## OTHER AUTHORITIES

Fed. R. Civ. Pro. 4(d)..........................................................................................................................3

Fed. R. Civ. Pro. 4(m).........................................................................................................................4

# INTRODUCTION

At the center of this suit are fragments of stone, bone and metal excavated in Peru and exported to Connecticut, where they remained (without complaint) for nearly a century. Peru now claims that those fragments belong to it, that in taking them from Peru and keeping them in Connecticut, Yale University has committed wrongful acts and omissions in Peru and Connecticut, and that a court should order Yale to inventory the pieces, account for any profits made from holding them, and ship them back to Peru. For whatever strategic reason – because it thought it could garner more international press attention in Washington, or because it deemed this a favorable forum – Peru, a foreign government, chose to file this lawsuit against Yale in the District of Columbia, where neither Peru, nor Yale, nor the disputed property resides.

Yale moved to dismiss the lawsuit, noting that neither local law nor the Constitution permits Peru to hale Yale into a D.C. court to defend claims arising from events in Connecticut and Peru. Peru responded by amending its complaint, cramming it with snippets of letters between Hiram Bingham of Yale and one of his funders, the D.C.-based National Geographic Society ("NGS"). Yale renewed its motion to dismiss, noting that the suit does not involve a dispute between Bingham and his D.C. funder: it involves claims by Peru over alleged Peruvian property in Connecticut. Peru responded by dredging up a hundred more letters that did not make the cut the first time.

The surfeit of exhibits cannot hide the flaws in Peru's choice of jurisdiction. Knowing that, Peru's opposition brief resorts to untenable legal arguments and factual sleights-of-hand. Peru bases its central argument on a "but for" theory of specific jurisdiction that has already been rejected by binding authority. Its remaining arguments for specific jurisdiction disregard entire doctrines, like the government contacts doctrine. On the facts, Peru descends to willful obfuscation and outright misrepresentation of its own pleadings. And forced to admit that it has failed to serve Yale in D.C. – a necessary prerequisite for general jurisdiction – Peru seeks to

blame Yale, asking this Court to announce a new rule that would set aside the D.C. legislature's statutory choice of a prerequisite for general jurisdiction.

None of these tricks can fix Peru's erroneous filing here. This suit does not belong in D.C., and Yale cannot be forced to defend it here consistent with the Constitution or the D.C. Code. It should be dismissed.

## ARGUMENT

**I.     Peru has failed to establish general personal jurisdiction over Yale.**

**A. Peru has failed to establish the statutory requirement for general jurisdiction.**

The D.C. statute authorizing general jurisdiction over a non-resident corporation imposes a "specific jurisdictional requirement . . . that service be made in the District of Columbia." *Everett v. Nissan Motor Corp.*, 628 A.2d 106, 108 (D.C. 1993) (citing D.C. Code § 13-334(a)). A plaintiff who fails to serve the summons on the defendant within the District, "fail[s] to comply with the statute's mandate . . . [and is] foreclosed from benefiting from its jurisdictional protection." *Gonzalez v. Internacional de Elevadores,* 891 A.2d 227, 233 (D.C. 2006) (quotation marks omitted). This jurisdictional rule is enforced even where it would be impossible to serve the defendant in the district, *id.* at 233 n.10 (rejecting general jurisdiction because plaintiff did not serve defendant in D.C., even though Mexico "was the only place where [defendant] could have been served, since the company has no offices and maintains no registered agent in the District of Columbia"), an unsurprising rule, since a defendant that cannot be served in the District should not be subject to general jurisdiction in the District.

Peru does not deny this. Nor does it deny that it served Yale in Connecticut. Instead, it asks this Court to waive the "specific jurisdictional requirement" enacted by the D.C. legislature and consistently enforced by the local and federal courts. *See* Response to Motion to Dismiss [doc. # 20] ("Opp.") at 20-24. It bases its novel request on the assertion that it was duped into serving Yale in Connecticut.

Peru bases its assertion on a single innocuous email exchange. *See* Opp. Ex. C-1. Several days after filing suit, Peru's attorney emailed Yale's General Counsel, stating: "We are preparing to serve the Complaint, and since we are unaware if Yale has counsel representing it other than you, we wanted to offer the University the opportunity to waive service. Please let me know if that approach is acceptable to the University, and whether you have a few moments to discuss the case tomorrow." *Id.* at 1-2. After the two exchanged brief emails regarding possible times to talk, Yale's General Counsel wrote back to say: "Meanwhile, on service of process, we do not wish to waive service. We will accept service as is customary in my office on campus, located at 2 Whitney Avenue, New Haven, CT, 6th Floor. Our general phone number is (203) 432-4949." *Id.* at 1.[1]

On the basis of that email – nothing else – Peru claims that it is "patently inequitable" for Peru to be held to the same jurisdictional rules as every other D.C. plaintiff, and asks this Court to conclude that "Yale should be found to have waived, or otherwise be estopped" from claiming the protection of the District's jurisdictional statute. Opp. at 21. That makes no sense. Yale did not say that it was willing to subject itself to general jurisdiction in D.C. Nor did Peru ask Yale to waive any objections to general jurisdiction in D.C. As the emails make clear, Yale declined Peru's request to waive even the service of process – let alone personal jurisdiction itself.

In fact, if Yale had accepted Peru's invitation to waive service, that waiver would not have subjected Yale to general jurisdiction in D.C. As Federal Rule of Civil Procedure 4(d)(5) plainly states, "[w]aiving service of a summons does not waive any objection to personal jurisdiction or to venue." *See also Everett*, 628 A.2d 108 (holding that a "general prescription for service of process cannot replace the specific jurisdictional requirement of D.C. Code § 13-334(a) that service be made in the District of Columbia").

---

[1] Peru was entitled to ask Yale to waive service, and Yale was entitled to decline. *See* Fed. R. Civ. Pro. 4(d).

There was nothing nefarious about Yale informing Peru that it was willing to accept service at the General Counsel's Office, and providing the courtesy of that office's address and phone number. Nothing about that statement stopped Peru from trying to serve Yale in D.C., if that is what Peru wanted to do. If, as Peru asserts, Yale had continuous and systematic contacts with D.C., it would have been easy to serve Yale in D.C. But Peru did not serve Yale in D.C. – either because it could not (since Yale does not in fact have continuous and systematic contacts with D.C.) or because it did not even try.[2]

The above makes plain that Peru's claims of waiver and estoppel are transparent after-the-fact attempts to avoid the consequences of its own strategic choices. Any doubt on that score would be assuaged by the timeline reflected on the docket of this case. Peru filed this lawsuit on December 5, 2008. Under the 120 days permitted for service under Fed. R. Civ. Pro. 4(m), Peru had until April 6, 2009 to serve Yale. On March 4, 2009, more than a month before those 120 days ran out, Yale filed its motion to dismiss the original complaint. That motion noted that Peru had failed to meet the statutory jurisdictional requirement of service in D.C. *See* Statement of Points and Authorities in Support of Motion to Dismiss [doc. # 10] ("Yale Br."), at 3 & n.1. Yet Peru did not serve Yale in D.C. in the ensuing month, before the 120 days ran out. Nor did it move this Court for an extension of time within which to accomplish service in D.C. Instead, Peru ignored the general jurisdictional defect, waited for the deadline to pass, then blamed Yale.[3]

---

[2] Peru asserts that Yale has litigated in D.C. before and "presumably knows the service requirements of this forum." Opp. at 21 n.14. The assertion is beside the point, as Peru could have tried to serve Yale in D.C. whenever it wished. Peru's assertion is also misleading. Of the four cases cited by Peru, two were loan collection actions brought against D.C. residents (and thus not involving D.C. Code § 13-334(a)), *see* Townsend Declaration Exs. 1-2 (cover pages for *Yale Univ. v. Brito* and *Yale Univ. v. Straker*); one was an *in forma pauperis* lawsuit dismissed *sua sponte* by Judge Gesell nine days after it was filed, before any service of process, *see id.* Ex. 3 (docket sheet for *Oppido v. Yale Univ.*); and the last is a case in which Yale was named a defendant but not served, and which in any event was filed *after* Peru served Yale in this case, *see id.* Ex. 4 (docket sheet for *Geronimo v. Yale Univ.*, filed Feb. 17, 2009).

[3] By contrast, in the only case Peru cites, the plaintiff was not only "'deprived of any opportunity to cure any defects in the process or in the service of process,'" but also deprived of any opportunity to pursue the suit at all, because defense counsel did not identify the defect until

Peru's argument boils down to this: it asked Yale to waive service, something that would not have subjected Yale to general jurisdiction in D.C.; Yale declined; Peru then served Yale in a manner that statutorily forecloses Peru from asserting general jurisdiction in D.C.; when Yale pointed this out, Peru still did not serve Yale in D.C. or even ask this Court for more time to do so; and all of this is Yale's fault – not Peru's – and a fault so grievous that the D.C. legislature's choice of a jurisdictional prerequisite should be disregarded.

Peru's attempt to pass the blame by casting itself as a duped innocent would ring hollow coming from any litigant. It rings all the more hollow coming from a sovereign nation represented by "one of the largest legal services providers in the world," comprising "nearly 4,000 lawyers in more than 65 offices." *See* http://www.dlapiper.com/global/about/overview/ (official DLA Piper website). Peru's lead counsel, who chairs one of DLA Piper's practice groups, previously served as General Counsel to the Immigration and Naturalization Service, served in senior positions in the Department of Justice, and has "extensive litigation experience as a trial attorney with the Department of Justice's Civil Division." *See* http://www.dlapiper.com/william_cook/ (official firm biography). He works out of DLA Piper's D.C. office. *Id.* One of the four other DLA Piper attorneys on Peru's brief has "10 years of experience litigating commercial cases in state and federal courts." *See* http://www.dlapiper.com/edward_scheideman/ (official firm biography). Peru and its lawyers either knew the D.C. jurisdictional rules and made strategic choices that they now regret, or they should have known them. Either way, the blame cannot be passed to Yale.

### B. Peru has failed to establish the constitutional requirements for general jurisdiction.

Peru has also failed to show that Yale's D.C. contacts are so "continuous and systematic" that Yale can be subject to general jurisdiction here consistent with due process. *Helicopteros*

---

after the statute of limitations had expired. Opp. at 22-23 (*quoting Storey v. Hailey*, 441 S.E.2d 602 (N.C. App. 1994); *see also id.* (admitting that "no court in the District of Columbia appears to have addressed waiver and estoppel under circumstances similar to those found here" and not pointing to any other case anywhere except *Storey*).

*Nacionales De Columbia v. Hall*, 466 U.S. 408, 416 (1984); *see also Everett*, 628 A.2d at 108 (D.C. law requires plaintiff to show that non-resident defendant has contacts so regular as to constitute a "continuing corporate presence in the forum state directed at advancing the corporation's objectives") (quotation marks omitted). Peru's allegations do not come close to meeting that burden.

Peru does not allege that Yale owns any property in D.C., maintains any offices or bank accounts in D.C., or employs any agents in D.C. (To the contrary, Peru complains about the lack of an in-District agent for service of process on Yale. Opp. at 23.) Rather, it alleges intermittent recruitment and alumni-service activities common to every major educational institution in the country:[4]

- an organization called the "Yale Club of Washington, DC" which exists "to serve the needs of Yale Alumni and families" in the area and "raise awareness [of] Yale as an option for college-bound students," Opp. Ex. A-114;

- a program that organizes activities for "students pursuing internships and other summer opportunities in the Washington, D.C. area," Opp. Ex. A-113;

- annual visits by admissions personnel to recruit D.C. students, Opp. at 19;

- a once-a-year three-day meeting in D.C. between Indian legislators and U.S. government and business officials as part of a leadership program based elsewhere, Opp. Ex. A-116;

- displays in Connecticut of art borrowed from D.C. galleries and the loan of paintings to a D.C. gallery, Opp. Exs. A-117-18;

- a once-a-year law school alumni association dinner, Opp. Ex. A-119;

- a single scholarly breakfast on legal globalization, Opp. Ex. A-120; and

---

[4] Some are not even part of Yale. The "Yale Club of Washington," for instance, is an independent "membership based, tax-exempt, 501(c)(3) non-profit organization," as Peru's own exhibit makes plain. *See* Opp. Ex. A-114 at 2.

- a one-time environmental job fair hosted with Duke University, Opp. Ex. A-121.

*See* Opp. at 19-20.[5]

Courts nationwide have consistently held that ordinary university outreach activities like these do not establish general jurisdiction over non-resident universities. *See, e.g., Richards*, 480 F. Supp. 2d at 230 (non-resident university's recruitment efforts, attendance at conferences, and lobbying activities in the District inadequate to establish general or specific jurisdiction); *Martin v. Clemson Univ.*, No. 07-536, 2007 WL 4531028 (E.D. Pa. Dec. 20, 2007) (no general jurisdiction over non-resident university despite contacts with the forum including: recruiting students at college fairs; targeting and recruiting high school athletes; sending faculty, students, staff, and administrators to participate in events in the forum; fundraising; licensing trademarks to forum residents; and purchasing goods and services from the forum).[6] Indeed, the Third

---

[5] Peru also attaches a 48-page exhibit alleging lobbying activities by Yale in the District. Opp. Ex. A-115. In so doing, it again ignores the government contacts doctrine, which excludes a non-resident defendant's lobbying-related contacts from the jurisdictional analysis. *See* Yale Br. at 10-11. The government contacts doctrine prevents the District from becoming the default forum for every lawsuit involving any organization that exercises its right to petition the government. *Id.*; *see also Richards v. Duke Univ.*, 480 F. Supp. 2d 222, 230 (D.D.C. 2007), *aff'd*, No. 07-5119, 2007 U.S. App. LEXIS 30275 (D.C. Cir. Aug. 27, 2007) ("Duke [University's] government relations and lobbying connections to the District of Columbia also do not form a basis for asserting personal jurisdiction because of a long-recognized 'government contacts' exception . . . to allow for petitioning the government and the redress of grievances.").

[6] *See also Kendall v. Trustees of Amherst Coll.*, No. 06-4983, 2007 WL 172396 (E.D. Pa. Jan. 18, 2007) (no general jurisdiction over non-resident college that used financial institutions in forum, designated 'class agents' in forum to coordinate alumni affairs, solicited donations from alumni in forum, and sent employees into forum high schools to recruit students); *Pierson v. St. Bonaventure Univ.*, No. 2:05 CV 0581, 2006 WL 181988 (S.D. Ohio Jan. 23, 2006) (no general jurisdiction over non-resident university despite regular attendance at revenue-generating varsity sports events in the forum, large student enrollment from the forum, revenue-generating training programs for teachers in the forum, recruitment activities in the forum, and active alumni organizations seeking to boost economic ties with the forum); *Gallant v. Columbia Univ.*, 111 F. Supp. 2d 638, 640-43 (E.D. Pa. 2000), *mand. den. by* 259 F.3d 715 (3d Cir. 2001) (no general jurisdiction over non-resident university despite forum activities including recruitment, fundraising, collection actions against residents, at least four trust accounts overseen by a forum bank, faculty participation in conferences and other academic activities in the forum, participation in revenue-generating athletic events in forum, and research contracts with at least six pharmaceutical companies conducting business in the forum); *Park v. Oxford Univ.*, 35 F.

Circuit has determined that asserting general jurisdiction over a non-resident school would violate due process even in the presence of substantially greater contacts than those alleged here. *See Gehling v. St. George's Sch. of Med., Ltd.*, 773 F.2d 539, 541-43 (3d Cir. 1985) (holding that non-resident medical school could not be subjected to general jurisdiction even though it solicited forum students through newspaper advertisements, sent agents into the forum to appear on radio and television promoting the school, and established a "feeder" program channeling students from a forum college to defendant medical school).

Peru cites no case to the contrary.[7] Like the plaintiff in *Scherer v. Curators of the Univ.*

---

Supp. 2d 1165, 1167-68 (N.D. Cal. 1997), *aff'd*, 165 F.3d 917 (9th Cir. 1998) (no general jurisdiction based on non-resident university's significant fund-raising activities and "long standing academic interaction" with forum, including reciprocal purchase of academic journals); *Hardnett v. Duquense Univ.*, 897 F. Supp. 920, 922-23 (D. Md. 1995) (no general jurisdiction over non-resident university even if recruiter visited college fair in forum state and even if toll-free number was made available to students in forum state to enable students to obtain more information about university); *Norris v. Oklahoma City Univ.*, No. C-93-1626-VRW, 1993 WL 313122, at *2 (N.D. Cal. Aug. 3, 1993), *aff'd*, 21 F.3d 1115 (9th Cir. 1994) (no general jurisdiction over non-resident university that maintained contact with current students and alumni within the forum); *Ross v. Creighton Univ.*, 740 F. Supp. 1319, 1324 (N.D. Ill. 1990), *rev'd in part on other grounds*, 957 F.2d 410 (7th Cir. 1992) (no general jurisdiction over non-resident university even if it employed full time recruiter in the forum, solicited students via direct mailing, and regularly participated in athletic competitions); *Antoine v. Syracuse Univ.*, No. CV030473601, 2003 WL 22481407 (Conn. Super. Ct. Oct. 20, 2003) (no general jurisdiction over non-resident university that recruited students from forum, conducted alumni activities in forum, and participated in athletic events in forum).

[7] The four cases that Peru does cite have nothing to do with universities, and each is readily distinguishable. As Peru admits, the non-resident defendant in *Price v. Griffin*, 359 A.2d 582 (D.C. Cir. 1976), "had [a] business office in [the] District, had sold stock there, and had conducted some of its negotiations for appointment to its board of directors and [given a] patent licensing agreement in [the] District." Opp. at 20. In *AMAF Int'l Corp. v. Ralston Purina Corp.*, 428 A.2d 849 (D.C. 1981), the non-resident corporation had been registered to do business in the District for over 25 years, maintained a registered agent for service of process in the District and "concede[d] that it does do business here, selling its products in our local supermarkets for both human and animal consumption." *Id.* at 851. Similarly, in *Ross v. Prod. Dev. Corp.*, 736 F. Supp. 285 (1989), the non-resident defendant was registered in the District for the business of distributing telephone directories, maintained a registered agent for service of process in the District, and in fact delivered telephone directories to customers inside the District "on a regular and ongoing basis twenty-one out of fifty-two weeks each year, year after year." *Id.* at 290. And in *Arista Records, Inc. v. Sakfield Holding Co., S.L.*, 314 F. Supp. 2d 27 (D.D.C. 2004), the corporation contracted to provide D.C. residents with 24-hour access to music downloads via an

*of Missouri & Law Sch. Admission Council*, 152 F. Supp. 2d 1278 (D. Kan. 2001), Peru "has

directed the court to no case in which a university from a nonforum state has been held subject

to the general jurisdiction of a forum state and, in fact, every case which the [defendant] has

uncovered holds directly to the contrary." *Id.* at 1282; *see also id.* at 1284-86 (D. Kan. 2001)

(finding no general jurisdiction on the basis of recruiting and admitting students from the forum,

employing forum residents, and maintaining an informational website). Peru has provided no

reason to upset the established precedent, and this Court should decline Peru's invitation to

deviate from the nationwide consensus.[8]

## II.    Peru has failed to establish specific personal jurisdiction over Yale.

To prevail on its claim that this Court can exercise specific jurisdiction over Yale, Peru

must prove that its claims are "substantially connected" with Yale's alleged business activity in

the District. *Shoppers Food Warehouse v. Moreno*, 746 A.2d 320, 334-35 (D.C. 2000) (*en

banc*); *see also Beachboard v. Trustees of Columbia Univ.*, 475 A.2d 398, 401 (D.C. 1984)

(holding that specific personal jurisdiction is not proper unless claims arise "from the particular

transaction of business carried out in the District") (quotation marks omitted).

Yale's opening brief explained why Peru's claims do not arise from the D.C. contacts

alleged by Peru. Those claims that, like replevin, seek the return of the objects, allege that

Peruvian ministerial resolutions passed in Peru require the return of objects excavated in Peru,

---

interactive website. *Id.* at 32-33. These cases bear no relationship to Peru's allegations.

[8] Peru's request for discovery on general jurisdiction (Opp. at 20 n.13) should also be denied. Peru has not even attempted to make a "detailed showing of what discovery it wishes to conduct or what results it thinks such discovery would produce," which is a prerequisite to jurisdictional discovery. *Kormendi/Gardner Partners v. Sur. Acquisition Venture, LLC*, 606 F. Supp. 2d 114, 120 (D.D.C. 2009) (HHK) (quotation marks and citations omitted) (denying discovery as to diversity jurisdiction); *accord Caribbean BC Sys. v. Cable & Wireless*, 148 F.3d 1080, 1090 (D.C. Cir. 1998) (upholding denial of discovery as to defendant's minimum contacts with forum for purposes of establishing personal jurisdiction). Absent such a showing, jurisdictional discovery would be nothing more than a "fishing expedition." *FC Inv. Gp. v. IFX Markets*, 529 F.3d 1087, 1094 (D.C. Cir. 2008) (quotation marks omitted) (upholding denial of discovery as to general personal jurisdiction over defendant).

exported to Connecticut, and converted in Connecticut. Yale Br. at 4-5. Likewise, the claims of unjust enrichment and for an accounting focus exclusively on unjust profits allegedly earned by Yale in Connecticut. Yale Br. at 5-6. Peru's contract claims arise from contracts allegedly formed between Yale and Peru (two non-residents), involving objects excavated in Peru and exported to Connecticut, contemplating performance in Connecticut and Peru, Yale Br. at 8, and which were negotiated in Peru, *id.* at 12-16; *see also id.* at 9-12. Finally, Peru's claims of fraud and fiduciary breach arise from allegations that Peru gave Yale permission (in Peru) to excavate artifacts in Peru and to export them to Connecticut, because Yale promised (in Peru) that it would return the objects from Connecticut to Peru when Peru asked. *Id.* at 16-17. None of these claims are "substantially connected" with the District.

Peru makes virtually no effort to deny any of this, and the half-hearted denials it does make misstate the law or mis-cite the amended complaint. *See infra* at II.B. Instead, Peru digs in its heels and swings for the bleachers, asking this Court to adopt a "but for" test for specific jurisdiction under the D.C. long-arm statute that the D.C. Court of Appeals and the federal courts in the District have rejected. *See infra* at Pt. II.A.

### A.  Peru asks this Court to set aside the established "substantial connection" test for specific jurisdiction in favor of a "but for" test.

Peru devotes the great bulk of its opposition to a single broad argument: Bingham got help in organizing his expeditions from the National Geographic Society (NGS); NGS is a D.C. organization; *ergo*, any claims arising from the expeditions may be brought in the District. This argument provides a convenient excuse for plunking down a ream of century-old letters to or from NGS, along with an affidavit in which a current NGS officer with no first-hand knowledge of the events of 1912-15 shares with the Court NGS's "position" on whether funding and other events in that era "took place in Washington." *See* Declaration of Terry D. Garcia, Opp. Ex. B. But neither NGS's archival materials nor its "position" advance Peru's "but for" theory of jurisdiction, which has no basis in D.C. law.

Peru casts its argument as widely as possible. It argues that specific jurisdiction over Yale is proper if Peru can show that a "claim itself is related *in any way* to acts which occurred in the District." *See* Opp. at 14 (emphasis added). By "any way," Peru means that if a DC contact is a "but for" cause of the claim, then DC has specific personal jurisdiction over the defendant. *Id.* (asserting that "each and every count . . . is related to Yale's activities in the forum . . . [because] the expeditions would never have occurred, and Peru would never have been divested of its property, but for Yale's activities in the District"). This is Peru's central argument for each of its seventeen claims.

- With regard to its claims for "violation of Peruvian law," replevin, wrongful retention, conversion, and related claims for civil conspiracy, Peru argues: "but for Yale's activities in the District, which included repeated trips and exchanges of correspondence with NGS . . . the Bingham-led expeditions would not have occurred," Opp. at 15;

- With regard to its claims for unjust enrichment and accounting, Peru argues: "but for Yale's activities in D.C. and the support it received from institutions and individuals located in D.C., the expeditions would not have taken place, and Yale would not wrongfully have Peru's Artifacts in its possession," *id.* at 18;

- With regard to its claims for breach of contract and breach of bailment contract, Peru argues: "NGS . . . was a key player and co-sponsor, whose funding, oversight, involvement, prestige, and support made possible the expeditions," *id.* at 17; and

- With regard to its claims for breach of fiduciary duty, fraud, fraudulent misrepresentation, and related civil conspiracy, Peru argues: "Were it not for Yale's activities in the District of Columbia [and] the participation of NGS . . . Yale would never have garnered the support that it needed for the Bingham-led expeditions, the expeditions would not have occurred, and Peru would not have been deprived of the Artifacts," *id.* at 15-16.

Peru cites no authority under which this Court could disregard the "substantial relation"

test and replace it with a new and unbounded "but for" test.[9] That should not be surprising, as

D.C. courts routinely find no specific jurisdiction on facts that, under Peru's "but for" analysis,

would guarantee jurisdiction.

In *Savage v. Bioport, Inc.*, 460 F. Supp. 2d 55 (D.D.C. 2006), Savage, a soldier, had been

injured by a vaccine supplied by Bioport, a non-resident defendant. Bioport had manufactured

the vaccine under contracts with the Department of Defense. *But for* those contracts, Savage

would not have received Bioport's vaccine and would not have been injured by it. But that was

not enough of a connection to justify specific jurisdiction over Bioport in D.C. The court

concluded that Savage had "not shown that his claim for relief arises from" the DOD-Bioport

contracts, because he had not brought a breach of contract claim under them, was not a party to

them, and had not alleged that the contracts were the source of his injury. *Id.* at 62 (quotation

marks and brackets omitted). Rather his "harm was a result of wrongdoing" allegedly done by

---

[9] The handful of older cases that Peru cites do not displace the "substantial relation" test and replace it with Peru's preferred "but for" test. In *Cohane v. Arepeja-California, Inc.*, 385 A.2d 153 (D.C. 1978), a salesman sued his employer to recover unpaid commissions on sales that he made both in D.C. and outside it. Since D.C. had personal jurisdiction over defendant for the claims arising from the D.C. sales, the court held it could also entertain the salesman's claims for commissions earned under the same employment contract in three nearby states. *Id.* at 158. Similarly, in *Chrysler Corp. v. Gen. Motors Corp.*, 589 F. Supp. 1182 (D.D.C. 1984), the carmaker sued to block a joint venture by GM and Toyota. Because the defendants had "extensive preparatory meetings in the District to discuss the legal implications of the joint venture," and deployed "employees and agents in this District to accomplish the different components of the joint venture," the court had jurisdiction over the suit even though some aspects of the joint venture called for performance outside the District. *Id.* at 1205-06. In both cases, the claims bore a substantial relation to the contacts. *See also Environmental Research Int'l, Inc. v. Lockwood Greene Engineers, Inc.* 355 A.2d 808, 813 (D.C. 1976) (rejecting specific jurisdiction because, *inter alia*, consulting with federal government officials "concerning the possibility of a grant" cannot possibly "constitute the transaction of business here" because of the government contacts doctrine). While it is true that "'[e]ven a small amount of in-jurisdiction business activity is generally enough to permit the conclusion that a nonresident defendant has transacted business here,'" Opp. at 4 (quoting *Envt'l Res. Int'l*, 355 A.2d at 811) (emphasis omitted), the claims must bear a significant relation to that business activity for the defendant to be subject to suit here. *See Envt'l Res. Int'l*, 355 A.2d at 812 (no personal jurisdiction over non-resident defendants that hired D.C. firm to secure funding for projects outside the District).

Bioport when it produced the vaccine in Michigan. *Id.* Even though Savage would not have been injured had it not been for Bioport's contract with the Department of Defense, the court refused to subject Bioport to specific jurisdiction in D.C. on the basis of that contract. *Id.*

Similarly, in *Helmer v. Doletskaya*, 290 F. Supp. 2d 61 (D.D.C. 2003), the plaintiff sued his former Russian girlfriend for, among other things, money that he lent her to buy an apartment. He alleged that they had entered into a contract for the loan in the District. Although formation of the contract was the "but for" cause of the harm alleged by the plaintiff, that was not enough to satisfy the long-arm statute: "even if the agreement to purchase the apartment were made in the District, no 'substantial connection' exists between this contract and the District of Columbia." *Id.* at 68, *aff'd in relevant part by Helmer v. Doletskaya*, 393 F.3d 201, 207-208 (D.C. Cir. 2004).[10]

The decisions of this District Court in *Savage* and *Helmer* – and the D.C. Circuit's affirmance in relevant part in *Helmer* – accord with the D.C. Court of Appeals' decisions. In *Trerotola v. Cotter*, 601 A.2d 60 (D.C. 1991), the plaintiff sought to establish personal jurisdiction over his non-resident employer for breach of an implied contract to provide retirement severance pay. The plaintiff asserted that his claim arose from the defendant's activities in the District, because he had earned the severance pay by working for the defendant in the District. *Id.* at 64. The Court of Appeals acknowledged that the plaintiff would not have had a claim to the severance pay "but for his employment activities in this jurisdiction." *Id.* But that was not enough. The non-resident defendant had moved out of the jurisdiction by the time it allegedly agreed to provide the severance pay, and the D.C. Court of Appeals concluded that the

---

[10] *Helmer* found jurisdiction lacking because the alleged loan contract had not been negotiated, and did not contemplate consequences, in D.C., even if it had been entered into here. 290 F. Supp. 2d at 68. If contract formation in D.C. – an undeniable "but for" cause – could alone support personal jurisdiction then courts would not need to consider the place of negotiation, the place of contemplated performance, or any of the factors that are considered in assessing whether a non-resident defendant may be forced to defend a contract claim. But such considerations are necessary. *See Helmer*, 393 F.3d at 205.

non-resident defendant's D.C. contacts were not "of such a quality and nature that they manifested a deliberate and voluntary anticipation of litigation here" over the alleged severance pay contract. *Id.* at 64-65 (internal quotation marks and brackets omitted); *see also id.* at 65 (rejecting dissent's broader theory of jurisdiction as "simply too attenuated a methodology").

If Peru's but-for theory is right, these cases were wrongly decided. But Peru is wrong. The D.C. Court of Appeals has explicitly considered and rejected a test in which D.C. contacts that are "but for" causes of the alleged wrongs would be enough to establish specific personal jurisdiction over an out-of-state defendant. In *Shoppers*, 746 A.2d 320, the D.C. Court of Appeals canvassed several different approaches to the nexus between contacts and claims required to establish specific jurisdiction over a non-resident defendant. The court considered the "'but for' test" and the "substantive relevance approach," among others, and noted the criticisms leveled at those tests. *Shoppers* then announced that it saw "no reason to deviate from" its continued commitment to the "substantial connection" test, and reaffirmed that inquiry as the proper one under D.C. law. *Id.* at 335.[11]

Because the D.C. Court of Appeals has rejected the but-for test, the rule is as it has always been: "Personal jurisdiction may be exercised . . . only if [the defendant] transacted business in the District in connection with the operative facts of this action." *Naartex Consulting Corp. v. Watt*, 722 F.2d 779, 786 (D.C. Cir. 1983) (quotation marks and brackets omitted).[12]

---

[11] Peru repeatedly cites *Shoppers*. *See* Opp. Table of Authorities (unnumbered page) (noting that *Shoppers* is Peru's most frequently cited case). It is not clear how Peru could repeatedly cite the case but nevertheless advocate the but-for test that the case rejects.

[12] Even if jurisdiction over Yale could be based on an attenuated "but for" causal relationship between Peru's claims and Yale's contacts with NGS, Peru has not met its burden of showing that the Bingham expeditions would not have occurred without NGS's support. To be sure, Bingham pursued NGS's assistance and was glad to receive it. But he had led expeditions to Peru without NGS's assistance before, Am. Compl. ¶ 18, and he was prepared to do it again. In February 1912, Bingham told Yale's President Hadley that "[a]pparently we are not going to have any great amount of difficulty in financing the next expedition," and presented him with three different proposals for funding that year's expedition to Peru, only one of which involved a (tentative) contribution from NGS. *See* Townsend Declaration Exs.5-6.

*Shoppers'* application of that rule is instructive. Although it rejects the expansive "but for" test, *Shoppers* nevertheless represents the D.C. Court of Appeals' high-water mark on the exercise of personal jurisdiction over non-resident defendants. The 4-3 majority framed the question before it narrowly, noting that the D.C. Court of Appeals had "never determined whether newspaper and other advertisements in the District by a nonresident corporation owning a chain of stores, some of which are located in very close proximity to the District's borders" represents "a sufficient nexus for the District's exercise of personal jurisdiction over a nonresident defendant" in a lawsuit for an injury that took place in one of the defendant's stores very close to the D.C. border but in a neighboring jurisdiction. *Id.* at 324. The majority stressed that Shoppers' barrage of advertising in D.C. was key to the decision. *See id.* at 336 (holding that the plaintiff's lawsuit in D.C. was reasonably foreseeable "as a result of [Shoppers'] advertising extensively and over a substantial period of time in the District's major circulation newspaper"). Shoppers had used its advertising barrage in order to "deliberately and directly solicit[] District residents" to leave D.C. and enter Shoppers' supermarkets in Maryland. *Id.* at 335. On those facts, D.C. had a significant interest in the litigation, and suit there was consistent with specific personal jurisdiction. *Id.* at 332, 336.[13]

Peru's claims bear no relation to those in *Shoppers.* Peru does not allege that Yale sent an onslaught of advertising into D.C. to lure anyone to leave the District and be injured elsewhere. Unlike the plaintiff in *Shoppers*, Peru does not allege that Yale "purposefully solicited" it to leave the protection of D.C. Moreover, Peru is not a D.C. resident. While *Shoppers* defended itself from the dissent's arguments by noting that the D.C. Court of Appeals had "always understood [the D.C. long-arm statute] to afford *District residents* broad access to our courts," *id.* at 337 (emphasis added), it said nothing about throwing open D.C. courthouse doors to forum-shopping foreign governments.

---

[13] Three judges would have held that D.C. had no jurisdiction over Shoppers. *Id.* at 337 (Wagner, C.J., dissenting); *id.* at 338 (Schwelb, J., dissenting, joined by Steadman, J.).

**B.    The claims asserted against Yale by Peru have no substantial relationship to Yale's alleged D.C. contacts.**

Aside from offering the rejected "but for" argument, *see supra* Pt. II.A., Peru cannot explain why this Court could exercise personal jurisdiction over a non-resident university for a foreign sovereign's attempt to reclaim objects that have been in Connecticut for nearly a century – objects excavated in and exported from Peru, pursuant to ministerial resolutions in Peru passed at the behest of a Connecticut professor working for a Connecticut university in Peru.

Peru's amended complaint alleges three types of Yale contacts with D.C.: (1) contacts with U.S. government officials; (2) contacts with Peru's ambassador; and (3) contacts with NGS regarding its provision of funding and related help for two expeditions. Yale explained in its opening brief why these contacts do not have a substantial relationship to Peru's claims. *See* Yale Br. at 4-18. Peru now also tries to tack on a fourth type of alleged D.C. contact: contacts with NGS regarding draft "working agreements" for two expeditions. None support jurisdiction over Yale for the claims Peru makes in this lawsuit.

**1.    Peru's claims do not arise from Yale's alleged D.C. contacts with the U.S. government.**

The amended complaint alleges that Yale asked U.S. government officials to lobby the Peruvian government for permission for Bingham to excavate and export artifacts from Machu Picchu, and that Yale also contacted U.S. government officials in the hopes of borrowing expedition equipment and learning of potential staff for the expedition. Am. Compl. ¶ 11. As Yale explained in its opening brief, contacts with the federal government may not be used to establish personal jurisdiction over a non-resident defendant. *See* Yale Br. at 10-11, & 19 n.14. Peru makes no effort to rebut this well-established doctrine. Instead, it merely reiterates the irrelevant factual allegations, as if the government contacts doctrine did not exist. *See* Opp. at 10-11; *see also id.* at 5, 9 & 9 n.3. Peru's decision to ignore the law does not make the law go away. Yale's alleged government contacts play no part in the jurisdictional calculus.[14]

---

[14] Even if Yale's contacts with the U.S. government could be considered, they would not support

## 2. Peru's claims do not arise from Yale's alleged contacts with Peru's ambassador in D.C.

The amended complaint asserts that Yale transacted D.C. business by "negotiati[ng] with Peru for permission to conduct the expeditions" via "the Peruvian Ambassador in Washington." Am. Compl. ¶ 11. Peru averred two contacts between Bingham and the ambassador involving the 1914-15 expedition, and none involving the 1912 expedition. Yale's opening brief showed why the two contacts – a social visit, *id.* ¶¶ 56, 59, and a request to NGS that it ask Peru's ambassador to relay a message to Lima, *id.* ¶¶ 62, 64 – could not plausibly be described as negotiations. Yale. Br. at 9-11; *see also Cellutech, Inc. v. Centennial Cellular Corp.*, 871 F. Supp. 46, 50 (D.D.C. 1994) (holding that communications sent to D.C. agent merely to be relayed to principal elsewhere do not count as D.C. contacts).

Peru does not defend its earlier characterization of these contacts as "negotiations" and makes no effort to distinguish *Cellutech*.[15] Instead, it now argues that Yale "had to win" the

---

specific jurisdiction over Yale for several reasons. First, the allegations of diplomatic intercession relate only to approval of the 1912 expedition, not the 1914-15 expedition. *See* Opp. at 10-12; Yale Br. at 11 n.7. Second, the U.S. government's support in 1912 did not lead to Bingham obtaining permission to excavate or export. That permission came in the form of a ministerial resolution that Peru refers to as "the Third Decree," Opp. at 11, issued half a year after the last U.S. governmental support cited by Peru. *Compare* Am. Compl. Ex. G (ministerial resolution of October 31, 1912) *with* Opp. at 10, citing Opp. Ex. A ¶¶ 60, 25, 26, 28 (pointing to Opp. Exs. A-58, A-23, A-24, and A-26, respectively) (letter from Bingham to Taft, and letters between Bingham and NGS, all dated between February and April 1912); *but cf.* Opp. at 10 (Peru's claim, unsupported by any citation to the amended complaint, that U.S. government officials "remained involved until the [1912] concession was secured"). As explained below, the resolution was achieved due to Bingham's vigorous lobbying in Lima, not by efforts in Washington. *See infra* Pt. II.B.2; Yale Br. at 13-14 & n.10. Third, while the concession to excavate sought by U.S. government officials would have lasted "preferably 20, but certainly not less than 10" years, Opp. Ex. A-59 (Feb. 26, 1912 letter from Department of State to U.S. Ambassador Clay), the 1912 ministerial resolution granted permission to excavate for only thirteen months. *See* Am. Compl. Ex. G.

[15] It simply reasserts the allegations regarding the requested message relay, and attaches the documents from which it had selectively quoted in the amended complaint. Opp. at 13 cites Opp. Ex. A ¶¶ 84, 85, 87, which refer to Opp. Exs. A-82, A-83, & A-85, which reiterate the material alleged at Am. Compl. ¶¶ 62 and 64. *Cf.* Yale Br. at 10 & 12 (explaining why Am. Compl. ¶¶ 62 and 64 aver no NGS participation in negotiations with Peru).

ambassador's support to get permission for the expeditions because, if it did not, "it was unlikely" that Bingham would have gotten permission for the expeditions. Opp. at 17. This is not even a "but for" argument. *Cf. supra* Pt. II.A. Peru asserts only that the claims *may* have arisen from Yale's contact with the ambassador.[16]

That comes nowhere near meeting its burden of showing a substantial connection between Yale's contacts and Peru's claims. *See* Yale Br. at 8; *see also Helmer*, 393 F.3d at 205 (requiring consideration of "contemplated future consequences, along with the terms of the contract and the parties' course of dealing") (quotation marks omitted). What led to the ministerial resolutions was intensive lobbying in Lima by Bingham and others; sporadic social visits or requests for message relays months earlier and thousands of miles away in D.C. were "insignificant in the scheme of the parties' dealings." *Id.* at 207 (quotation marks omitted); *see also* Yale Br. at 12-16.

### 3.     Peru's claims do not arise from NGS' funding or related efforts in D.C.

The amended complaint alleges that NGS gave Yale funding and helped Bingham find equipment and staff for the 1914-15 expedition. *See* Am. Compl. ¶¶ 131, 133 (funding for 1912 and 1914-15 expeditions); ¶ 68 (funding, equipment, staff for 1914-15 expedition). NGS provided its funding under two grant contracts that Yale and NGS – not Peru – signed. *See id.* ¶ 44 ("In May 1912, NGS and Yale entered into" a contract); ¶ 65 ("In March 1914, NGS and Yale entered into" a contract); *see also* Opp. Ex. A-38 (1912 grant contract); *id.* Ex. A-91 (1914 grant contract).

As Yale explained in its opening brief, Peru's claims do not arise from the grant contracts

---

[16] Even that inadequate assertion lacks backing. Peru supports it only with a March 2, 1912 letter, Opp. at 17 (citing Opp. Ex. A ¶ 61, referencing Opp. Ex. A-59), but the letter has nothing to do with Peru's ambassador: he did not write it, is not mentioned in it, and is not the addressee. The cited letter is from Taft to H. Clay Howard, the U.S. ambassador in Lima, asking Howard to "render all proper support to Doctor Bingham and the other representatives of Yale." Ex. A-59; *see also* Opp. at 10 (admitting that Howard was the U.S. ambassador in Lima).

between NGS and Yale. Yale Br. at 17-19. Nor do they arise from related support that NGS allegedly provided in connection with those contracts. *Id.* at 19 n.14. Yale noted that the D.C. District Court has considered and rejected the argument that a non-resident who enters into a contract with a D.C. funder can be subjected to jurisdiction here by a third party allegedly harmed by the funded project. *See id.* at 19 (*citing AGS Int'l Servs. S.A. v. Newmont USA Ltd.*, 346 F. Supp. 2d 64, 82 (D.D.C. 2004)).

Peru's brief ignores *AGS Int'l* – and ignores the fact that allowing a third party to sue a non-resident defendant in D.C. whenever the defendant receives assistance from a D.C. funder would "inundate the courts in this jurisdiction" with "countless lawsuits" in "which the District has no interest." *AGS Int'l*, 346 F. Supp. 2d at 82. Peru simply reiterates that NGS funded the expeditions, reiterates its allegations of related support, and asserts that but for the grants and related support, the expeditions would not have happened.[17] That is not enough. *See* Pt. II.A.

### 4. Peru's claims do not arise from D.C. contacts by Yale in connection with draft "working agreements."

Yale's opening brief noted that Peru's contract theory is unclear. Yale Br. at 6-8.[18] The amended complaint alleges facts that might be construed as asserting three possible contractual relationships: (1) a "draft May 1912 Memorandum of Working Agreement between Peru, NGS

---

[17] In any event, the assertions cannot bear the weight that Peru puts on them. Peru has not shown that the expeditions would not have gone forward but for the NGS funding. *See supra* note 12. Nor could it possibly show that the expeditions would not have proceeded without an NGS reference letter and some alleged help finding staff and equipment. *See* Opp. at 8, 12. Many of these assertions involve NGS's alleged government contacts, which are irrelevant to the jurisdictional analysis. *See supra* Pt. II.B.1. Moreover, they are not supported by the record. For example, Peru claims that NGS helped to secure a first-aid kit ("Detached Service Chest") from the U.S. War Department for the 1914-15 expedition, but Peru points only to correspondence showing that Bingham asked NGS to ask the U.S. government for help. *See* Opp. at 12, citing Ex. A ¶ 86 (referencing Ex. A-84). Other documents show that, in the end, the government refused. *See* Townsend Declaration Ex. 7; *see also generally* Yale Br. at 19 n.14.

[18] Peru asserts that it can establish personal jurisdiction over Yale on the basis of the Yale-NGS grant contracts, reiterating the rejected "but for" theory. *See supra* Pt. II.A. But Peru does not assert any claims arising from the Yale-NGS contracts, to which it was not a party. *See* Opp. Exs. A-38, A-91 (Yale-NGS grant contracts).

and Yale," *see* Am. Compl. ¶ 97 & Am. Compl. Ex. M, *see also* Yale Br. at 7; (2) the ministerial resolutions of 1912 and 1916 were contracts, *see* Am. Compl. Exs. G & L, *see also* Yale Br. at 7; or (3) a contract under which Peru would promulgate the resolutions based on promises made by Yale while lobbying, *see* Am. Compl. ¶¶ 98, 107, 91, *see also* Yale Br. at 7-8.

Peru ignores the third theory, disavows the second,[19] and retrenches to the first theory, asserting that "NGS and Yale later entered into a working agreement with Peru to allow the exploration of the Incan ruins at Machu Picchu and the surrounding areas as well as to export artifacts for a limited time for study in the United States." Opp. at 9. This contract allegedly governed the 1912 expedition. *See* Am. Compl. ¶ 46 ("In May 1912, recognizing that he needed to memorialize Peru's grant of permission to mount a third expedition, Bingham, on behalf of NGS and Yale, drafted a memorandum of a working agreement which sought permission to explore further the Incan ruins at Machu Picchu and the surrounding areas as well as export artifacts for a limited time for study in the United States.").

The alleged May 1912 draft working agreement cannot support the exercise of personal jurisdiction over Yale in the District for Peru's breach of contract claims. Peru acknowledges that Bingham wrote the draft working agreement. Am. Compl. ¶ 46. By its own terms, the draft working agreement contemplates performance only in Peru and Connecticut (and in a minor way in New York) – with no performance whatsoever contemplated in D.C. The draft would have required Bingham "to bring to Peru a properly equipped scientific expedition as soon as it is possible to properly organize such an expedition, or within two years after the granting of this decree." Am. Compl. Ex. M at 1. Bingham would have "exercise[d] all due care in excavating to see to it that the ancient monuments [in Peru] are in no way destroyed . . . ." *Id.*. He would have "place[d] at the disposal of the Consul General of Peru in New York within two years of the date of their arrival from Peru examples of all the kinds of archeological or geological specimens

---

[19] *See* Opp. at 16 (characterizing Yale's mention of this contract theory as one under which "Peru confuses the various laws for binding contracts").

that have been exported from Peru . . . ." *Id.*. He would have "submit[ted] to the Peruvian Government . . . a full and complete report of the work carried on in Peru . . . ." *Id.*. Peru would have granted the expedition certain privileges for a period of five years from the date of the issuance of an official decree by the Peruvian Government, including: "The privilege of carrying on scientific exploration in Peru and of bringing in free of duty all outfit and equipment necessary;" "The privilege of calling on the civil and military authorities for the granting of all possible facilities;" "The privilege of carrying on archaeological excavations" in Peru; and "The privilege of bringing to New Haven, Connecticut, all the results of excavations and research, on condition that after these have been properly studied and reports on them prepared, or after a period of not more than two years after the date of their arrival in New Haven, Connecticut, good specimens of all the kinds of articles found are to be delivered in good order to the Consul General of Peru in New York. . . ." *Id.* at 1-2; *see also* Am. Compl. ¶ 97 (quoting some provisions of Am. Compl. Ex. M).

Peru makes a few desperate final assertions in its opposition brief, but none are supported by Peru's own amended complaint. Peru asserts that "NGS was also a party to the working agreements with Peru and Yale for the 1912 and the 1914-1915 expeditions." Opp. at 17. It cites nothing in support. All Peru can possibly mean is the single May 1912 draft working agreement – the only one alleged by the amended complaint. *See* Am. Compl. ¶¶ 46, 97, Ex. M. It also asserts that "NGS negotiated the contracts in Washington, D.C., it signed them in D.C., and it performed its obligations under the agreements in D.C." Opp. at 17.[20] Again, Peru cites nothing to support its assertions. It does not allege that NGS negotiated the May 1912 draft working agreement in D.C. (or anywhere else); it does not allege that anyone signed the 1912 draft working agreement in D.C. (or anywhere else); and it does not allege that NGS performed any obligation under the 1912 draft working agreement in D.C. (or anywhere else). Nothing in

[20] *See also* Opp. at 9 (asserting in context of 1912 expedition that, "NGS and Yale later entered into a working agreement with Peru to allow exploration of the Incan ruins and Machu Picchu").

Peru's own pleadings would allow Peru to force Yale to defend a claim for a breach of the 1912 draft working agreement in D.C.[21]

## III. Venue is not proper in this District.

Peru's amended complaint asserts that venue here is proper under 28 U.S.C. § 1391(a)(2), which lays venue only in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred." *Id.*; *see* Am. Compl. ¶ 8. Yale showed in its opening brief that a substantial part of the events giving rise to each of Peru's claims did not occur in D.C., and noted that this District Court had dismissed for improper venue cases with significantly more relevant D.C. contacts. *See* Yale Br. at 21-23 (citing, *inter alia*, *Abramaoff v. Shake Consulting, LLC,* 288 F. Supp. 2d 1, 4-5 (D.D.C. 2003)).

Peru makes no response to those cases, and it cites no case in which a district court has held venue to be proper despite a connection to the forum as attenuated as the one here.[22] Instead, it blithely asserts that no significant events giving rise to its claims occurred in

[21] Even if Peru had shown a substantial connection between Yale's D.C. contacts and the alleged breach of the alleged unexecuted May 1912 draft working agreement, that connection would not provide specific jurisdiction over Yale with regard to any contract claims arising from the 1914-15 expedition – let alone any non-contract claims. *See Helmer*, 393 F.3d at 205-208 (separately analyzing jurisdiction over each contract and tort claim).

[22] The cases Peru cites involve more serious connections to the forum. *See Lamont v. Haig*, 590 F.2d 1124, 1136 (D.C. Cir. 1978) (suit by Indian reservation residents that federal officers in D.C. devised and ran an unconstitutional scheme to deploy military forces for law enforcement on the reservation); *Modaressi v. Vedadi*, 441 F. Supp. 2d 51 (D.D.C. 2006) (suit against family members who allegedly embezzled profits from restaurant in District by taking money from customers in return for free drinks, directing employees to bring proceeds from the restaurant outside the District, and using a courier in the District to export stolen funds, causing injury in District when restaurant was seized to satisfy unpaid tax obligations); *Great Socialist People's Libyan Arab Jamahiriya v. Miski*, 496 F. Supp. 2d 137, 143 (D.D.C. 2007) (venue was proper in District for action by Libya to control websites falsely representing connection to Libya, where Libya alleged that it had met with defendant in District and denied permission to use its name and because the website at issue was "maintained by a business organization that is both headquartered and primarily operates in the District of Columbia."); *Neufeld v. Neufeld*, 910 F. Supp. 977, 986 (S.D.N.Y. 1996) (relatives sued for intentional infliction of emotional distress, where most of the alleged wrongs – including false reports of abuse to state agencies in forum – had taken place in forum and "almost all of the harm alleged" occurred in forum).

Connecticut. Opp. at 26. The assertion is baseless.[23] Peru alleges it permitted Yale to export objects from Peru to Connecticut on the condition that Yale study the objects in Connecticut and return them to Peru from Connecticut. Am. Compl. ¶¶ 178, 184-85, 192. It claims that Yale stored the objects in Connecticut without studying them. *Id.* ¶ 195. Peru claims that Yale's alleged failure to study the objects in Connecticut, and its failure to return them from Connecticut, constitutes a breach of contract, a breach of fiduciary duty, fraud, and conversion. *Id.* ¶¶ 184, 185, 195, 202, 173. Peru also alleges that the decision to retain the objects in Connecticut was the result of a conspiracy between two Connecticut entities – Yale and its agent, Bingham. *Id.* ¶¶ 227, 234, 241. It seeks replevin of the objects from Connecticut, and it demands an inventory of objects stored in Connecticut and an accounting of profits allegedly realized by Yale, in Connecticut, from exhibiting the objects. *Id.* ¶¶ 165, 263, 268.

While Connecticut clearly has a substantial connection to the claims, the question here is whether D.C. also does. Peru turns to a now familiar list of "activities in Washington, D.C." that it says have "operative significance" to the claims in this case: efforts "to draft, negotiate and execute the contracts in this case," efforts "to garner staffing support," efforts "to garner financial support," and efforts "to garner diplomatic support." Opp. at 27-28.

The allegations regarding financial, diplomatic, and staffing support are no more relevant to venue than to personal jurisdiction. In the venue analysis, a material event does not "giv[e] rise to the claim" merely because it is somewhere along a "but for" causal chain; it gives rise to the claim only if it is an event that the plaintiff must prove in order to establish liability. *See Lamont*, 590 F.2d at 1135 (venue "would lie in the District of Columbia if appellees' liability

<hr>

[23] A court need not accept factual allegations related to venue if contradicted by the defendant. *See Jyachosky v. Winter*, No. 04-01733, 2006 WL 1805607, at *1 (D.C. June 29, 2006) (HHK) (court must accept factual allegations on motion to dismiss for improper venue "unless contradicted by an evidentiary showing"); *see also Miski*, 496 F. Supp. 2d at 141) ("courts will grant a 12(b)(3) motion if facts are presented that defeat the plaintiff's assertion of venue") (quotation marks, brackets and ellipsis omitted).

expectably could be established in substantial part by proof of acts or omissions occurring here."). Peru would not need to prove how Bingham staffed, funded, and equipped his expeditions – let alone the alleged D.C. diplomatic precursors to the expeditions – in order to prove its claims. They are thus irrelevant in the determination of proper venue.

The same is true of allegations regarding Yale's efforts in D.C. to draft, negotiate and execute what Peru describes with apparently deliberate vagueness as "the contracts in this case." If Peru means the 1912 or 1914 Yale-NGS grant contracts, *see* Am. Compl. ¶¶ 44, 65; Opp. Exs. A-38, 91, they do not give rise to any of Peru's claims, since Peru is not a party to them, does not (and could not) sue upon them, and need not prove anything about them to press its contract claims against Yale. If Peru means the May 1912 draft working agreement, *see* Am. Compl. ¶¶ 46, 97, the amended complaint avers that Bingham drafted it – and nowhere avers that it was negotiated in D.C. or executed anywhere. *See supra* Pt. II.B.4. If Peru means to characterize the 1912 ministerial resolution as itself a contract, *see* Am. Compl. ¶ 48, Peru has not shown that the resolution was "negotiated" – if the term even applies to the passage of a foreign law – in D.C.; the record shows that any lobbying that counted happened in Lima. *See supra* Pt. II.B.2; Yale Br. at 12-16.

Peru's argument for venue here cannot be squared with its admission that the propriety of venue must be evaluated on the basis of "'events having operative significance in the cases, and a commonsense appraisal of the implications of those events'" on the presentation of evidence. Opp. at 27 (quoting *Sharp Electronics Corp. v. Hayman Cash Register Co.*, 655 F.2d 1228 (D.C. Cir. 1981)); *see also Lamont*, 590 F.2d at 1134-35 ("[T]he substantiality of the operative events is determined by assessment of their ramifications for efficient conduct of the suit."). None of Peru's seventeen claims would require Peru to show how Bingham funded his expeditions, or how he got his first-aid kit, or who recommended the assistant topographer. None of those events would have any "operative significance" in the presentation of evidence. Instead, "a

commonsense appraisal" of the claims by Peru against Yale – all of which concern objects excavated in Peru, exported to Connecticut and residing in Connecticut for more than a century -- makes plain that D.C. did not play a substantial part in the events that Peru would have to prove.

## CONCLUSION

For the reasons stated above and in Yale's opening brief, this civil action should be DISMISSED for lack of personal jurisdiction and improper venue or, if this Court finds that it is in the interests of justice, TRANSFERRED to the District of Connecticut pursuant to 28 U.S.C. § 1406(a).

Respectfully submitted,

Date:  July 9, 2009

   /s/     Jonathan M. Freiman
Jonathan M. Freiman (D.C. Bar # D00322)
Jeffrey R. Babbin (D.C. Bar # 384557)
Tahlia Townsend
WIGGIN AND DANA LLP
One Century Tower
P.O. Box 1832
New Haven, CT 06508-1832
(203) 498-4400
(203) 782-2889 (fax)
jfreiman@wiggin.com
jbabbin@wiggin.com
ttownsend@wiggin.com

R. Scott Greathead (*pro hac vice*)
WIGGIN AND DANA LLP
450 Lexington Avenue
Suite 3800
New York, NY 10017
(212) 490-1700
(212) 490-0536 (fax)
sgreathead@wiggin.com

Attorneys for Yale University